

**Signed January 04, 2015.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 11-11252-HCM |
| | § | |
| THINK3, INC. | § | (Chapter 11) |
| | § | |
| Debtor. | § | |
| THINK3 LITIGATION TRUST, | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 13-1081-HCM |
| FILIPPO ZUCCARELLO, | § | |
| FABRIZIO GIUDICI, JOSEPH | § | |
| COSTELLO, SY KAUFMAN, AND | § | |
| MARK PERRY, | § | |
| Defendants. | § | |

**OPINION REGARDING MOTIONS TO DISMISS AND TO TRANSFER VENUE**

This adversary proceeding pits a litigation trust created by a confirmed plan of reorganization (as Plaintiff) against former directors and officers of the chapter 11 Debtor (as Defendants). Plaintiff's claims revolve around alleged breaches of fiduciary duties by and avoidable transfers to the prior directors and officers of the Debtor. The underlying substance of the proceeding is interesting for a myriad of reasons, including that the Defendants were directors and officers of the Debtor before a pre-bankruptcy merger, two of the Defendants are residents of and worked primarily in a foreign country (Italy), an Italian insolvency proceeding involving the Debtor was commenced, and issues of Delaware corporate law are implicated.

At the outset (and not expectedly), the Defendants filed Motions to Dismiss on various grounds-including Rule 12(b)(6)-and alternatively to transfer venue of this

1

proceeding to Delaware. For the reasons set forth in this Opinion, the Defendants' Motions to Dismiss under Rule 12(b)(6) are primarily denied and partially granted, and their request to transfer venue to Delaware is denied.

## I.
## PROCEDURAL BACKGROUND

### A. Bankruptcy Case

On May 18, 2011, Think3 Inc., as debtor ("Think3"), filed a voluntary Chapter 11 petition in this Court in case no. 11-11252. Think3 is a Delaware corporation and a global technology company. Think3 is based in the United States with offices and subsidiaries in several other countries, including a large branch office in Italy. *See* Voluntary Petition (case no. 11-11252, dkt# 1).

Prior to the Chapter 11 filing by Think3 in the United States, an involuntary bankruptcy/insolvency proceeding was filed against Think3 in Italy and a trustee had been appointed by the Italian court ("Italian Trustee"). The Italian Trustee subsequently filed a Chapter 15 petition in this Court in case no. 11-11925 seeking recognition of the Italian proceeding. Recognition of the Italian foreign proceeding was ultimately denied by this Court, and the Chapter 15 case was dismissed on September 12, 2011. *See* Chapter 15 Petition; Order (case no. 11925, dkt# 1, 79).

The voluntary Chapter 11 case filed by Think3 remained pending in the United States in this Court. On July 3, 2010, this Court entered a Confirmation Order which confirmed the Modified Amended Plan of Reorganization filed by Think3 ("Plan"). In part, the Plan created the Think3 Litigation Trust (Plaintiff in this adversary proceeding) to pursue causes of action of Think3 for the benefit of creditors. On September 28, 2012, the Plan became effective. *See* Confirmation Order (case no. 11-11252, dkt# 533, pp. 1–14); Plan (case no. 11-11252, dkt# 533, pp. 16–108); Litigation Trust Agreement (case no. 11-11252, dkt# 533, pp. 73–104); Notice of Effective Date (case no. 11-11252, dkt# 572).

### B. Adversary Proceeding

#### 1. Complaint and Parties

This adversary proceeding no. 13-1081 was commenced on May 15, 2013 by the Think3 Litigation Trust, as Plaintiff ("Plaintiff Trust") by the filing of its Complaint ("Complaint"). *See* Complaint (dkt# 1).

The Complaint named seven Defendants, most of which are former directors and officers of Think3, as follows: Filipo Zuccarello ("Defendant Zuccarello"); Joseph Costello ("Defendant Costello"); Sy Kaufman ("Defendant Kaufman"); Mark Perry ("Defendant Perry"); Fabrizio Giudici ("Defendant Giudici"); Thomas Davis ("Defendant Davis"); and Nest Consulting Ltd. ("Defendant Nest").

2

Four of the seven named Defendants reside in foreign countries (primarily Italy), and three of the named Defendants reside in the United States. As a result, it took time to serve the foreign-based defendants with process through the Hague Convention.

## 2. Motions to Dismiss/Transfer Venue

Four separate Motions to Dismiss were filed by various groups of Defendants, described as follows.

On August 14, 2013, Defendants Costello, Kaufman, and Perry ("US Director Defendants") filed an Amended Motion to Dismiss or Alternatively Transfer Venue with brief in support (dkt# 20) ("US Directors Motion"). On October 14, 2013, Plaintiff Trust filed a Response to the US Directors Motion; and on November 4, 2013, the US Director Defendants filed a Reply (dkt# 39, 42).

On November 1, 2013, Defendant Davis filed a Motion to Dismiss with brief in support (dkt# 41) ("Davis Motion"). On November 22, 2013, Plaintiff Trust filed a Response to the Davis Motion; and on November 27, 2013, Defendant Davis filed a Reply (dkt# 45, 46).

On March 13, 2014, Defendant Giudici filed a Motion to Dismiss with brief in support (dkt# 54) ("Giudici Motion"). On April 11, 2014, Plaintiff Trust filed a Response to the Giudici Motion; and on April 12, 2014, Defendant Giudici filed a Reply (dkt# 55, 57).

On May 16, 2014, Defendant Zuccarello filed a Motion to Dismiss or Transfer Venue (dkt# 62) ("Zuccarello Motion"). On July 7, 2014, Plaintiff Trust filed a Response to the Zuccarello Motion; and on July 17, 2014, Defendant Zuccarello filed a Reply (dkt# 69, 70).

## 3. Prior Ruling on Portions of Motions to Dismiss

The Motions to Dismiss filed by the Defendants sought dismissal on multiple grounds—including lack of personal jurisdiction and insufficiency of service of process under Rule 12(b)(2) and Rule 12(b)(5) of the Federal Rules of Civil Procedure ("Rules"), which is incorporated by reference into Rule 7012 of the Federal Rules of Bankruptcy Procedure "("Bankruptcy Rules").

As a result, the Court bifurcated the hearing on the Motions to Dismiss—to first address the request for dismissal for lack of personal jurisdiction (which also involved challenges to subject matter jurisdiction) and insufficiency of service of process. On February 5, 2014, the Court entered an Order permitting Plaintiff Trust to conduct limited discovery on the issues of personal jurisdiction (dkt# 52).

On August 21, 2014, this Court conducted a hearing on the Motions to Dismiss filed by the Defendants with respect to lack of personal jurisdiction and insufficiency of

service of process. On September 19, 2014, the Court issued a lengthy oral ruling on the record in open Court on these portions of the Motions to Dismiss (dkt# 79). In short, the Court denied the Motions to Dismiss on the grounds of lack of personal jurisdiction, lack of subject matter jurisdiction, and insufficiency of process—with one exception. The Court granted the Motion to Dismiss filed by Defendants Davis for lack of personal jurisdiction under Rule 12(b)(2). As a result, Defendant Davis has been dismissed as a party to this adversary proceeding. *See* Order entered September 19, 2014 (dkt# 71, 72, 73, 74). Defendant Nest has also been dismissed as a party to this adversary proceeding.[1]

### 4. Hearing and Opinion on Remainder of Motions to Dismiss

The net result is that now there are five remaining Defendants in this adversary proceeding—Defendants Costello, Kaufman, and Perry (the "US Director Defendants"); Defendant Giudici; and Defendant Zuccarello (collectively hereafter "Defendants").

The Court then conducted a hearing on November 5, 2014 on the remaining grounds set forth in the Defendants' Motions to Dismiss—i.e., the US Directors Motion, the Giudici Motion, and the Zuccarello Motion (collectively hereafter "Motions"). The remaining grounds set forth in the Motion are primarily a request for dismissal under Rule 12(b)(6) and to some extent Rule 9, and a request to transfer venue of this adversary proceeding to Delaware. This Opinion addresses these remaining grounds set forth in the Motions.

### II.
### SUMMARY OF PLAINTIFF TRUST'S COMPLAINT

In general, Plaintiff Trust's Complaint paints a picture of a company (Think3) that went from a global leader in niche areas of the software market, to a company that suffered tremendous financial distress resulting from the Defendants' gross negligence, self-dealing transactions, and utter failure to monitor Think3's business risk.

The Complaint is comprised of 24 pages with 86 paragraphs, and sets forth nine causes of actions (Counts) against the Defendants. *See* Complaint (dkt# 1). Following is a summary of the primary allegations in the Complaint filed by Plaintiff Trust against the Defendants.

The Defendants held various roles with Think3, according to the Complaint. Defendant Zuccarello is alleged to be a founder of Think3, the former Chief Executive Officer and a former director of Think3, and then later a consultant and "de facto officer" of Think3. Defendants Costello, Kaufmann and Perry are alleged to all be former directors of Think3. Defendant Giudici is alleged to be the former Chief Operating Officer of Think3, but never a director. *See* Complaint ¶¶ 4, 7–10, 19, 22, 40.

---

[1] Plaintiff Trust filed a Notice of Voluntary Dismissal Without Prejudice of Defendant Nest (a company affiliated with Defendant Davis), and the Court has dismissed Defendant Nest as a party to this adversary proceeding. *See* Notice; Order (dkt# 82, 83).

Defendants Zuccarello, Costello, Kaufmann and Perry are collectively referred to as the "Board" in the Complaint, and will sometimes be referred to in this Opinion as the "Director Defendants."

After a series of name changes and mergers, Think3 became a Delaware corporation in 2000. The Complaint alleges that Think3's principal place of business is located in Austin, Texas and that it has a worldwide presence through five-wholly owned subsidiaries based in Germany, France, Japan, India, and China. In addition, Think3 is alleged to have conducted business in Italy through a branch office as a division of Think3. *See* Complaint ¶¶ 14–16.

The Complaint alleges that Think3 never operated at a profit, losing over $95 million since its inception. From 2004 to 2009, Think3 is alleged to have lost over $43 million. The losses allegedly include a $10 million failed investment in a Chinese joint venture. In early 2008, it is alleged that the Director Defendants caused Think3 to enter into a $10 million investment in a joint venture with Beijing E-Tech Technology Co, Ltd. ("China JV"). According to the Complaint, the Director Defendants consciously disregarded Think3's weak financial status, and committed over two years of total income to the China JV. Think3's Chinese partners with the China JV allegedly embezzled Think3's investment, resulting in a total loss of Think3's $10 million investment. *See* Complaint ¶¶ 17–18, 25.

In 2009 and 2010, Think3 was suffering from major cash shortfalls and had been insolvent since at least 2009, according to the Complaint. Beginning in 2009, the Defendants allegedly engaged in a series of interested party loans ("2009 Loans") for their own personal gain to provide secured financing to Think3. The Complaint alleges that prior to the 2009 Loans, Think3 had funded operations exclusively with equity financing through sales of stock. In November 2009, the Director Defendants allegedly raised Think3's total debt by approximately 33% and authorized about $1.3 million in short-term debt with secured promissory notes bearing 8% interest. The 2009 Loans also allegedly provided the participants with warrants to purchase additional shares of Think3 stock. Defendant Zuccarello allegedly received a note from Think3 in the amount of $127,500 but never funded the loan to Think3. Likewise, Defendant Giudici allegedly received a note in the amount of $45,000 from Think3 and never funded the loan to Think3. The Complaint further alleges that Defendant Perry's company received a note in the amount of $593,495; Defendant Kaufman funded loans through four separate companies that he owned in the amounts of $193,564, $158,742, $35,238, and $18,976; and Defendant Costello received a note in the amount of $50,000.[2] The Complaint alleges that the 2009 Loans were never approved by the shareholders and were not approved by disinterested directors. *See* Complaint ¶¶ 26–30.

In 2010, Think3 received more interested party loans ("2010 Loans") in the form of secured notes, according to the Complaint. Without a Board meeting, the Director Defendants allegedly approved another $740,715 in secured debt. Nearly all the

---

[2] Pennies and cents (but hopefully not sense) are intentionally omitted by the Court in the dollar figures used in this Opinion.

participants in the 2010 Loans are alleged to be Think3 directors or officers, including Defendant Costello, Defendant Kaufman's companies, and Defendant Perry's company. *See* Complaint ¶ 31.

Despite the cash infusions from the 2009 Loans and 2010 Loans, Think3 remained insolvent and could not pay its debts as they became due, according to the Complaint. As a result, the Defendants decided the best option would be to market and sell Think3, still burdened with the 2009 and 2010 Loans, according to the Complaint. No purchaser could be found on those terms, and Think3 allegedly became more financially distressed. *See* Complaint ¶ 32.

Finally, on September 28, 2010, Think3 was acquired by ESW Capital LLC ("ESW") pursuant to the Agreement and Plan of Merger ("2010 Merger"). As part of the 2010 Merger, the Defendants allegedly resigned their positions as directors and officers of Think3. *See* Complaint ¶ 19. But, after the 2010 Merger, Defendant Zuccarello allegedly remained as a consultant, controlled Think3's Italian operations, and acted as a "de facto officer." *See* Complaint ¶¶ 19, 40. There are no allegations in the Complaint regarding Defendant Giudici's involvement with Think3 after the 2010 Merger.

As part of the 2010 Merger and acquisition by ESW, almost all of the 2009 Loans and 2010 Loans were terminated according to the Complaint. In exchange for the loan terminations, the Director Defendants allegedly allowed the loan participants to obtain broad releases from Think3 for involvement in the 2009 Loans and 2010 Loans. As an additional benefit from the 2010 Merger, the Complaint alleges Think3 purchased a six year "tail" Director and Officer Policy for the benefit of the Defendants as former directors and officers of Think3. *See* Complaint ¶ 34.

The loans allegedly owed by Think3 to Defendant Zuccarello and Defendant Giudici, however, were not terminated as part of the 2010 Merger. Instead, the Complaint alleges that in connection with the 2010 Merger, Defendant Zuccarello and Defendant Giudici received amended and restated notes ("New Notes") that more than doubled the amounts that Think3 owed. These New Notes allegedly provided for 15% interest and were secured by Think3 assets. The New Notes are alleged to be the subject of a Mandatory Prepayment Agreement between Think3, ESW, and Wilson Sonsini (Think3's former counsel). This Mandatory Prepayment Agreement essentially guaranteed payments to both Defendant Zuccarello and Defendant Giudici after they left the company by diverting money from Think3 to their New Notes. As a result of the Mandatory Prepayment Agreement, in January 2011, Defendant Zuccarello allegedly was paid $240,832 and Defendant Giudici was paid $99,437 on the New Notes. In addition, other payments were allegedly made to Defendant Zuccarello within a year of Think3's bankruptcy filing as a result of certain "Side Agreements" negotiated by Defendant Zuccarello at the time of the 2010 Merger. *See* Complaint ¶¶ 35–38.

The Complaint alleges that by writing and without a meeting, the 2010 Merger with ESW was approved by the Think3 stockholders ("Written Consent"). The Written Consent and Board minutes allegedly reflected that the 2010 Merger was an "interested

6

party" transaction as to the Defendants. According to the Complaint, there were misleading statements in the Written Consent; specifically, the Written Consent (1) excluded the increases in the New Notes payable to Defendants Zuccarello and Giudici, (2) failed to disclose the Mandatory Prepayment Agreement and that the New Notes were secured by assets of Think3, and (3) failed to disclose the arrangement to pay Think3 invoices directly to counsel for the benefit of Defendants Zuccarello and Giudici. *See* Complaint ¶ 39.

After the 2010 Merger, the new Think3 board and management allegedly tried to reduce costs, increase efficiency, and raise additional capital. But, this process was disrupted on March 11, 2011, according to the Complaint, when some of Think3's Italian creditors, including an Italian government entity that was owed a large tax liability ("Italian Tax Liability"), filed an involuntary insolvency proceeding against Think3 and its subsidiary in Italy. *See* Complaint ¶ 20.

The Italian Tax Liability of Think3 had grown to approximately $23 million by 2011, according to the Complaint. It is alleged that the Director Defendants utterly failed to track and manage the massive and increasing Italian Tax Liability.  *See* Complaint ¶ 24. The Director Defendants also allegedly failed to conduct and record regular Board meetings from 2005 to 2010. Despite records demonstrating that Think3 was consistently losing millions of dollars, and the Italian Tax Liability was growing at $3 million per year, there were allegedly only six Board meetings from 2005 to 2010. *See* Complaint ¶ 23. The Italian Tax Liability was allegedly increasing by $3 million a year, and by 2009, had grown to over $20 million. Plaintiff Trust alleges in the Complaint that the Director Defendants' "entire plan" to deal with the Italian Tax Liability was its "hope" to obtain a 7-year payout from the Italian government. Plaintiff Trust further alleges this would have required Think3 to miraculously find $3 million a year to pay off the Italian Tax Liability, which could not have reasonably been accomplished based on Think3's financial track record. Plaintiff Trust also alleges it is unclear when the Director Defendants even began tracking the Italian Tax Liability. Think3 allegedly did not have audited financial statements, and Think3 also never consulted with any experts as to the legal ramifications of the tax liabilities from operating in Italy until 2010 when the Defendants faced potential personal liability for the Italian Tax Liability. The Complaint also alleges that the Director Defendants manipulated the financial statements of Think3 to improve its Italian operations which may have increased the Italian Tax Liability. This significant Italian Tax Liability is alleged to be the reason for the failure and bankruptcy of Think3. *See* Complaint ¶ 24.

Plaintiff Trust's Complaint sets forth both state law causes of action and bankruptcy causes of action against the Defendants, in nine different Counts.

Count 1 of Plaintiff Trust's Complaint is against all the Defendants, and is based on alleged "breach of fiduciary duty" owed to Think3 by the Defendants (including the duties of loyalty, care and good faith) and alleges self-dealing, bad faith and gross negligence by the Defendants. In a similar vein, Count 2 of the Complaint is against all the Defendants and alleges "gross negligence" by the Defendants in failing to manage

Think3's operations with care. *See* Complaint ¶¶ 43–47.

Plaintiff Trust sets forth a hodgepodge of factual allegations to support Count 1 and Count 2 of its Complaint. In sum, the factual allegations include contentions that the Defendants: (1) failed to conduct and record regular Board meetings during Think3's financial crisis, deferred control of the Board to Defendant Zuccarello, and failed to manage the corporate affairs of Think3; (2) failed to inform themselves of the financial condition of Think3 to create a plan to end the financial decline; (3) intentionally abdicated the responsibility to exercise independent judgment; (4) failed to exercise oversight and prepare for the massive Italian Tax Liability; (5) committed Think3 to the failed China JV investment; (6) failed to disclose to stockholders material terms of the 2010 Merger—such as the releases of claims by Think3 relating to the 2009 and 2010 "interested party" loans; (7) committed fraud on the stockholders and/or made misleading statements to stockholders in connection with the 2010 Merger; (8) engaged in the 2009 and 2010 Loans, which were interested party transactions that burdened Think3 with new secured debt; (9) permitted Defendants or entities that Defendants controlled to obtain liens on Think3 assets; (10) forced Think3 to "sell" secured notes and debt instruments to Defendants and their entities which burdened Think3 and chilled its ability to find buyers for Think3 at a higher price; (11) authorized substantial payments to Defendants Zuccarello, Giudici and others as part of the 2010 Merger when creditors of Think3 were not being paid; (12) failed to exercise independent judgment in approving the New Notes, Mandatory Prepayment Agreement, and Side Agreements with Defendants Zuccarello and Giudici; (13) knowingly failed to exercise independent judgment in approving diversion of the Toyota invoice owed to Think3 to pay the New Notes and Mandatory Prepayment Agreement; (14) committed corporate waste and approved fraudulent transfers to Defendants Zuccarello and Giudici; (15) consciously disregarded that the China JV had failed and continued to divert much needed assets to invest in this failed enterprise; (16) failed to protect the existing corporate assets of Think3 for the benefit of creditors and shareholders; and (17) Defendants Zuccarello and Giudici breached their fiduciary duties by demanding and accepting the New Notes, Mandatory Prepayment Agreement, payments thereon, the Side Agreements, consulting agreements and other payments. *See* Complaint ¶ 44–50.

Count 3 of the Complaint alleges "fraud on stockholders of Think3" against the Board (Director Defendants). Plaintiff Trust apparently attempts to assert this claim for damages on behalf of the pre-2010 Merger stockholders of Think3 who were allegedly harmed by the Director Defendants' misleading statements and omitted material facts in connection to the 2010 Merger. *See* Complaint ¶¶ 51–52.

Count 4 of the Complaint is against Defendant Zuccarello and Defendant Giudici for recovery of "preferential transfers" under 11 U.S.C. §§ 544, 547, and 550. Plaintiff Trust alleges that Defendants Zuccarello and Giudici received funds and/or rights to funds or security interests from Think3 within one year of Think3's bankruptcy filing, at a time when they were "insiders" or as a result of agreements entered into while they were "insiders." In sum, the allegedly preferential transfers identified are the New Notes, the Mandatory Prepayment Agreement, payments on the New Notes and Mandatory

Prepayment Agreement, security interests, the Side Agreements, and "other payments" within one year of Think3's bankruptcy filing. Plaintiff Trust alleges that Defendants Zuccarello and Giudici "arranged" to receive preferential transfers while they were still "insiders" of Think3.  *See* Complaint ¶¶ 53–60.

Count 5 of the Complaint is against Defendant Zuccarello and Defendant Giudici for recovery of "fraudulent transfers" under 11 U.S.C. § 548. In sum, Plaintiff Trust alleges that Defendant Zuccarello and Defendant Giudici received significant funds (payments on the New Notes and Mandatory Payment Agreements and "other payments") and rights under agreements (the 2009 Loans, 2010 Loans, the New Notes, the Mandatory Prepayment Agreement, security interests, the Side Agreements and amended consulting agreements) within two years of Think3's bankruptcy filing.  *See* Complaint ¶¶ 61–68.

Count 6 of the Complaint is against Defendant Zuccarello for "breach of contract." Plaintiff Trust alleges that Defendant Zuccarello executed a promissory note and did not repay this loan to Think3.  *See* Complaint ¶¶ 69–70.

Count 7 of the Complaint seeks "disallowance" of the claims of Defendant Zuccarello and Defendant Giudici under 11 U.S.C. § 502(b)(1) based on both Defendants' allegedly fraudulent and improper behavior. Further, Count 7 seeks to disallow any claims that Defendant Zuccarello or Defendant Giudici might have under 11 U.S.C. § 502(d) as they have not repaid alleged preferential and fraudulent transfers that they have received. *See* Complaint ¶¶ 71–75.

Count 8 of the Complaint seeks "subordination" of any claims of all Defendants under 11 U.S.C. § 510(b) and/or § 510(c). Plaintiff Trust alleges that any claim by Defendants should be equitably subordinated to claims of all other creditors and equity interest holders due to inequitable conduct and unfair advantage. *See* Complaint ¶¶ 76–78.

Count 9 of the Complaint is against all Defendants and seeks a "declaratory judgment" of the disallowance and subordination of the Defendants' claims under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. *See* Complaint ¶¶ 79–80.

### III.
### LEGAL STANDARD AND EVIDENCE-RULE 12(b)(6) MOTION

#### A.  Plausibility Pleading Standards

Rule 8, which governs pleading requirements, is incorporated into Bankruptcy Rule 7008. In relevant part, Rule 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b), which governs a motion to dismiss, is incorporated into Bankruptcy Rule 7012(b).  Rule 12(b)(6) provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted."

The Supreme Court opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) provide a framework for the factual allegations that a complaint must contain to survive a motion to dismiss under Rule 12(b)(6). *See Johnson v. City of Shelby*, --- U.S. ----, 135 S. Ct. 346, 347 (2014). Both the *Iqbal* and *Twombly* decisions emphasize that a claim for relief under Rule 8 must provide enough facts to state a claim for relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570; *see also Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).  Determining if a plausible claim has been well-pleaded is "context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663–64. According to the Supreme Court, the plausibility standard is not the same as "probability requirement," but requires more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

A claim has "facial plausibility" if the plaintiff pleads factual content that allows the court to draw a "reasonable inference" that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. In the context of Rule 12(b)(6), a court must accept all well-pleaded facts in the complaint as true and view all facts in the "light most favorable to the plaintiff." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (supporting citations omitted). However, "threadbare recitals" of the elements of a cause of action that are supported by mere conclusory statements are not sufficient. *Iqbal*, 556 U.S. at 678. Instead, legal conclusions must be "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Therefore, a court should only "liberally construe" well-pleaded facts in favor of a plaintiff. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

According to the Fifth Circuit, a motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *Collins*, 224 F.3d at 498 (supporting citations omitted). A complaint must be liberally construed in favor of a plaintiff, and all facts pleaded in the complaint must be taken as true in the context of a Rule 12(b)(6) motion. *See Collins*, 224 F.3d at 498 (supporting citations omitted).

The task of a court under Rule 12(b)(6) is not to evaluate the plaintiff's likelihood of success; instead, a court must only decide whether the plaintiff states a "legally cognizable claim that is plausible." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014). Under Rule 12(b)(6), the issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 235–36 (1974)).

### B. Four Corners Rule and Extrinsic Evidence

In determining a motion to dismiss under Rule 12(b)(6), the general rule is that a court may only consider factual allegations within the "four corners" of the complaint. *Morgan v. Swanso*n, 659 F.3d 359, 401 (5th Cir. 2011). While Rule 12(d) permits a court to consider evidence outside the pleadings, it requires that a motion to dismiss be

treated as and converted to a motion for summary judgment under Rule 56. If a Rule 12(b)(6) motion is converted to a motion for summary judgment, Rule 12(d) requires that all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion. *See* Rule 12(d).[3]

The Fifth Circuit has crafted an exception to the "four corners" rule. *Collins*, 224 F.3d at 498–99. Under the *Collins* exception, a court may consider extrinsic documentary evidence in the context of a Rule 12(b)(6) motion if: (1) the document is attached to a defendant's motion to dismiss; (2) the document is referred to in the plaintiff's complaint; and (3) the document is "central" to the plaintiff's claims. *Collins*, 224 F.3d at 498–99. While the first two elements are straightforward, the Fifth Circuit has not "articulated a test for determining when a document is central to a plaintiff's claims." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011).

By analyzing the Fifth Circuit case law, it is apparent that a document which is "central" to a plaintiff's claim does not apply to documents that support affirmative defenses. The U.S. District Court for the Northern District of Texas defined "central to plaintiff's claims" to mean that documents are central when "they are necessary to establish an *element* of one of the plaintiff's claims." *Kaye*, 453 B.R. at 662 *(emphasis added)*. An analysis of the Fifth Circuit precedent indicates that the *Kaye* approach is correct. *See, e.g.*, *In re Katrina Canal Beaches Lit.*, 495 F.3d 191, 205 (5th Cir. 2007) (courts may consider contracts at motion to dismiss stage that are central to breach of contract suit).

Here, the Defendants have attached the following extrinsic documents to their Motions, to which Plaintiff Trust has objected to the Court considering in the context of the Rule 12(b)(6) Motions: Agreement and Plan of Merger between Think3 and ESW; Certificate of Nonforeign Status Entity; Mandatory Prepayment Agreement between Think3 and Defendant Zuccarello and Defendant Giudici; Note and Warrant Termination Agreements for the Defendants and their affiliates; Certificate of Merger filed with the Delaware Secretary of State; Think3 Confidential Stockholder Information Statement; and Think3's Sixth Amended and Restated Certificate of Incorporation. *See* Exhibits to Motion (dkt# 20-2, 20-3, 20-4, 20-5). None of these exhibits are essential or central to the elements of Plaintiff Trust's *prima facie* case. It is well established that a plaintiff is not "required to prove his case at the pleading stage." *Kittay v. Kornstein*, 230 F.3d 531, 542 (2d Cir. 2000). Therefore, with respect to the extrinsic documentary evidence filed by Defendants with their Motions, this Court will not consider any documentary extrinsic evidence for the purpose of Rule 12(b)(6) on the basis of the *Collins* "central to plaintiff's claim" exception to the four corners rule.

## C. <u>Judicial Notice</u>

Additionally, a court may properly take judicial notice under certain circumstances with respect to a Rule 12(b)(6) motion. Under Rule 201(b)(2) of the

---

[3] Here, the instant Motions filed by the Defendants have not been treated as or converted to a motion for summary judgment under Rule 12(d).

Federal Rules of Evidence ("FRE"), a court may take judicial notice of a fact that "is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In the context of a Rule 12(b)(6) motion, courts may take judicial notice under FRE 201(b)(2) of "public disclosure documents required by law to be filed." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

In ruling on a motion to dismiss, courts may "consider matters of which they may take judicial notice." *See, e.g.*, *Stone v. Life Partners Holdings, Inc.*, --- F. Supp. 2d ----, 2014 WL 2795238, at *22 (W.D. Tex. May 15, 2014) The plain reading of FRE 201(d) supports such a result, as the rule states, "The court may take judicial notice at any stage of the proceeding." Applying the plain language of FRE 201(d), the Fifth Circuit has permitted lower courts to take judicial notice at the motion to dismiss stage of a proceeding. *See, e.g.*, *Dorsey*, 540 F.3d at 338 (recognizing that a court is permitted to rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (taking judicial notice of public disclosure documents filed with the Securities and Exchange Commission).

Here, the Defendants attached much extrinsic documentary evidence to their Motions under Rule 12(b)(6), to which Plaintiff Trust has objected. *See* Exhibits to Motion (dkt# 20-2, 20-3, 20-4, 20-5). In the context of the Motions filed by Defendants under Rule 12(b)(6), this Court will only take judicial notice of public documents that have been filed with the Delaware Secretary of State. The only documentary evidence submitted by Defendants that qualifies for judicial notice in the context of the Rule 12(b)(6) Motions are (1) the Certificate of Merger of HSCI and Think3, with Sixth Amended and Restated Certificate of Incorporation of Think3 dated September 28, 2010 (dkt# 20-4) (Exhibit #10) and (2) the Sixth Amended and Restated Certificate of Incorporation of Think3 filed on January 31, 2008 (dkt# 20–5) (Exhibit #12). Both of these documents bear a governmental seal or signature, and their accuracy is beyond reasonable dispute. *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litig.*, 959 F. Supp. 2d 476, 496 (S.D.N.Y. 2013) (finding that permits which bore a government seal were subject to judicial notice in the context of Rule 12(b)(6)).

For these reasons, the other factual and documentary evidence cited by the Defendants and attached to their Motions has not been considered by the Court in ruling on their request for dismissal under Rule 12(b)(6).

## IV.
## <u>BREACH OF FIDUCIARY DUTY/GROSS NEGLIGENCE (Counts 1 and 2)</u>

Count 1 of the Complaint is based on alleged "breach of fiduciary duty" owed to Think3 (a Delaware corporation) by all the Defendants, including alleged breaches of the duties of care, loyalty, and good faith. Count 1 alleges self-dealing, bad faith and gross negligence by the Defendants. Similarly, Count 2 of the Complaint alleges "gross negligence" by the Defendants in failing to manage Think3's operations with care.

The Defendants have sought dismissal of Count 1 and 2 of the Complaint under Rule 12(b)(6) for a plethora of reasons, including lack of sufficient and plausible factual allegations to support such claims, the business judgment rule, an exculpatory charter provision, and the *Bangor Punta* doctrine.

Generally, under Delaware law, directors may be liable for breaching two fiduciary duties to the corporations which they manage—the duty of care and the duty of loyalty. *See, e.g.*, *Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC)*, 2014 WL 5861765, at *9 n.32 (Bankr. D. Del. November 12, 2014) (supporting citations omitted). The aftermath of *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006) and *Stone v. Ritter*, 911 A.2d 362 (Del. 2006) relegated the lesser developed "duty of good faith" as a subset of the duty of loyalty. Likewise, officers owe the same fiduciary duties of care and loyalty as directors to a corporation under Delaware law. *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009).

## A. <u>Duty of Care</u>

In Count 1 and Count 2 of the Complaint, Plaintiff Trust attempts to distinguish between the Defendants' alleged violations of their fiduciary duty of care (Count 1), and Defendants' alleged gross negligence (Count 2). These two theories, however, are indistinguishable. Under Delaware law, breach of the duty of care is "predicated upon concepts of gross negligence." *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012). As a result, Count 1 of the Complaint to the extent it alleges a breach of the duty of care, and Count 2 of the Complaint based on gross negligence, will be jointly addressed by the Court as a breach of duty of care claim.

In determining whether directors have violated their duty of care, under Delaware law, a court should only examine the "rationality of the process employed" by a board. *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 122 (Del. Ch. 2009). Even if board decisions result in significant losses, the "content of the board decision" is not examined. *See Citigroup,* 964 A.2d at 130 ("[I]t is well established that the mere fact that a company takes on business risk and suffers losses–even catastrophic losses–does not evidence misconduct, and without more, is not a basis for personal director liability"). Unlike a breach of the duty of good faith, a duty of care violation does not require intentional conduct. *See Walt Disney*, 906 A.2d at 66–67.

Directors must make an "informed business judgment" to satisfy their duty of care. *See Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Del. 1985). This requires that "all material information reasonably available" must be considered. *Reed v. Linehan (In re Soporex)*, 463 B.R. 344, 371 (Bankr. N.D. Tex. 2011) (applying Delaware law). Directors cannot be held responsible for failing to consider information that was "immaterial or out of the Board's reasonable reach." *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). A failure to make an informed business decision will only result in liability if

the directors' conduct was committed with gross negligence or beyond the "bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008). For these reasons, Delaware courts have been "extremely stringent" in finding directors liable for breaching their duty of care. *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008).

### 1. Directors Defendant Zuccarello, Costello, Kaufman, and Perry

According to the Complaint, the Director Defendants (Defendants Zuccarello, Costello, Kaufmann and Perry) violated their duty of care based primarily on two business decisions: the Italian Tax Liability and the China JV investment. Accepting Plaintiff Trust's well-pleaded allegations as true (as required in the Rule 12(b)(6) context), the Director Defendants are alleged to have made business decisions that could be characterized (in hindsight) as "stupid" or "egregious" or "irrational." However, the fact that Defendant Directors may have made poor business decisions is not a basis for breaching the duty of care. *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

Instead, the question for determining a breach of the duty of care remains: According to the factual allegations in the Complaint, did the Director Defendants act grossly negligent in connection with their process for making informed business decisions related to the Italian Tax Liability and the China JV? The answer is yes, based on the allegations in the Complaint. Providing Plaintiff Trust with every reasonable inference and assuming the allegations are true (as required in the Rule 12(b)(6) context), the Complaint sufficiently and plausibly alleges that the Director Defendants violated their duty of care.

With regard to the Italian Tax Liability, the Complaint alleges that the Director Defendants allowed a massive tax liability to develop, which accounted for $23 million or about 70% of Think3's debt. Plaintiff Trust alleges that it was unclear when the Director Defendants even actually began tracking this liability. According to the Complaint, the best case scenario was that the Director Defendants hoped to obtain a seven-year payout from the Italian government to pay off their Italian tax liability at $3 million per year. While the Italian Tax Liability was growing, Think3 allegedly failed to have audited financial statements, and the Director Defendants failed to regularly meet on an annual basis. In 2006 and 2007, Think3 allegedly failed to hold even one board meeting. Throughout 2005 to 2010, when Think3 lost over $40 million, it is alleged that at most, there were only six Board meetings. *See* Complaint ¶¶ 23–25.

With regard to the China JV, in the midst of Think3's growing financial troubles and continued losses, Think3 allegedly invested $10 million in a risky joint venture that had a track record of being unprofitable. Even though Plaintiff Trust does not allege that the Director Defendants were responsible for the Chinese partners stealing Think3's investment, the process used to make that investment was allegedly grossly negligent, based on reasonable inferences in the Complaint. *See* Complaint ¶¶ 23–25.

Taken together, the Court concludes that Plaintiff Trust has alleged sufficient facts against the Director Defendants to push their breach of duty of care claim past the starting line from sheer possibility to plausibility in the context of Rule 12(b)(6). The Court is mindful that it must not view the decisions of the Director Defendants on a hindsight basis or engage in "Monday-morning quarterbacking." *See In re Oracle Corp.*, 867 A.2d 904, 932 (Del. Ch. 2004) (noting the need to protect directors from claims merely alleging ordinary negligence). But assuming Plaintiff Trust's allegations are true (which is the standard under Rule 12(b)(6)), it is reasonable to believe that the Director Defendants were grossly negligent in making informed business judgments. The Director Defendants allegedly were not holding annual meetings and were not tracking the Italian Tax Liability. Before investing $10 million in the China JV, the Director Defendants should have at least considered the Italian Tax Liability, and the fact that they were committing to an investment that almost exceeded Think3's "total income" for the previous two years.[4] But they allegedly did not. Furthermore, there is no indication that it would be unreasonable to expect a global company like Think3 to track its tax liabilities or hold annual board meetings. To the contrary, from the allegations in the Complaint, it appears that the Director Defendants was fully capable of conducting board meetings. They allegedly waited until mid-2010 to hold board meetings and only when potential personal liability could have resulted from Think3's failure to pay taxes and its Italian employees. *See* Complaint ¶¶ 24–25.

For these reasons, the request to dismiss Count 1 (to the extent that it asserts a breach of the duty of care) and to dismiss Count 2 (gross negligence, which is premised on breach of duty of care) under Rule 12(b)(6) as against Director Defendants Zuccarello, Costello, Kaufmann and Perry must be denied.

### 2. Defendant Giudici

The Complaint alleges that Defendant Giudici was only an officer, but not a director on the Board of Think3. Plaintiff Trust fails to allege in the Complaint that Defendant Giudici was involved in any of the alleged transactions relating to the breach of duty of care. First, as an officer of Think3, it cannot be reasonably inferred that Defendant Giudici was involved in the decision to not conduct Board meetings. Furthermore, in the Complaint, Plaintiff Trust has only alleged that the Board (the Director Defendants) failed to conduct and record regular meetings. *See* Complaint ¶ 23. Second, with regard to the Italian Tax Liability, the Complaint again focuses exclusively only on the Board's actions, which does not implicate a non-Board member such as Defendant Giudici. *See* Complaint ¶ 24. Finally, the Complaint alleges that it was the Board's decision to enter the China JV; it is not alleged that Defendant Giudici (a non-Board member) was involved with the China JV decision. *See* Complaint ¶ 25. And during oral argument, counsel for Plaintiff Trust effectively conceded that the Complaint failed to allege any breach of duty of care against Defendant Giudici.

For these reasons, Count 1 (to the extent that it asserts a breach of duty of care

---

[4] According to the Complaint, "total income" is defined in accordance with IRS form 1120 on Think3's tax returns, prior to deduction of expenses on that form. *See* Complaint ¶ 25 n.11.

claim), and Count 2 of the Complaint (gross negligence, which is premised on the breach of the duty of care) must be dismissed as against Defendant Giudici. Plaintiff Trust should not be granted leave to amend its breach of duty of care and gross negligence claims against Defendant Giudici.[5]

## B. Duty of Loyalty

Count 1 of the Complaint also alleges a breach of the duty of loyalty, including self-dealing, by all the Defendants. *See* Complaint ¶¶ 26-47.

Under Delaware law, the duty of loyalty requires that the "best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). To satisfy the fiduciary duty of loyalty, a fiduciary's decision must objectively be based "entirely on the corporate merits of the transactions" and cannot be "influenced by personal or extraneous considerations." *Cede*, 634 A.2d at 362. A claim for breach of the duty of loyalty is most typically raised when a corporate fiduciary either is involved in "self-dealing" or usurps a "corporate opportunity." *Cede*, 634 A.2d at 360; *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 964 (Del. 1980). Acting with subjective good faith is not a defense. *See In re Primedia, Inc. S'holder's Litig.*, 67 A.3d 455, 489 (Del. Ch. 2013).

Corporate fiduciaries who are on both sides of a transaction are engaged in "self-dealing." As a result, they lose the protection of the business judgment rule and carry the "burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the court." *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Entire fairness consists of two main concepts: "fair dealing and fair price." *Weinberger*, 457 A.2d at 711. On the other hand, if disinterested directors or disinterested shareholders approve a self-interested transaction, the burden will shift back to a plaintiff to prove that the transaction complained of "was not entirely fair." See 8 Del. C. § 144(a)(1)–(2); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1222–23 (Del. 1999).

The duty of loyalty generally requires that a self-interested transaction was "material" to a fiduciary in order to be actionable. *Cinerama v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995); *Solomon v. Armstrong*, 747 A.2d 1098, 1118 (Del. Ch. 1999) Materiality has been described as a transaction that is of a "sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by [his] overriding personal interest." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 45 (Del. Ch. 2013); *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 393 (Bankr. N.D. Tex. 2011) (applying Delaware law) ("In other words, to be disqualifying, the nature of the director interest must be substantial, not merely incidental."). Under Delaware law, the test to determine whether a transaction is material is based on the subjective

---

[5] *See, e.g.*, *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 402 (E.D.N.Y. 2013) (leave to amend should not be granted if there is undue delay, bad faith, undue prejudice, or futility).

"actual person" standard. If a fiduciary would be or was affected by the self-interested transaction, a valid claim for the breach of duty of loyalty exists. *See Cinerama*, 663 A.2d at 1167.

Notably, however, in cases of "self-dealing" where a director stands on both sides of a transaction, allegations of materiality are not required under Delaware law. *See Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 839 n.17 (3d Cir. 2010) (applying Delaware law); *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002). Allegations of materiality are only required when the fiduciaries are alleged merely to be self-interested. *See Cede*, 634 A.2d at 362 (affirming Chancery Court's ruling that the absence of evidence of "self-dealing" requires a finding of materiality).

Here, contrary to the Defendants' position, Plaintiff Trust has alleged that the Defendants engaged in self-dealing instead of merely self-interested transactions. With regard to the 2009 Loans and 2010 Loans, according to the Complaint, the Defendants were all directly dealing with Think3 in their individual capacities or through their corporate entities that they individually controlled, and were on both sides of the transactions. *See* Complaint ¶¶ 27–32. Therefore, Plaintiff Trust is not required to allege materiality against the Defendants to survive a motion to dismiss the breach of duty of loyalty claims under Rule 12(b)(6).

### 1. Director Defendants Costello, Kaufman, and Perry

Plaintiff Trust alleges that the Director Defendants Costello, Kaufman, and Perry engaged in a series of interested party transactions with Think3 in 2009 and 2010 that breached their duty of loyalty. According to the Complaint, these Director Defendants were responsible for lending money individually or through wholly-owned corporate entities to Think3 through the 2009 Loans and 2010 Loans. The Complaint alleges that prior to this time, equity transactions were used to fund Think3, but that changed in 2009 and 2010 when these Director Defendants required and obtained secured debt financing from Think3 at a time that Think3 was in severe financial distress. *See* Complaint ¶¶ 26–31.

With respect to Defendant Costello, Plaintiff Trust alleges that he was responsible for personally loaning $50,000 in the 2009 Loans and was involved in a portion of the $740,715 loaned to Think3 in the 2010 Loans. With respect to Defendant Kaufman, Plaintiff Trust alleges that he was responsible for his various companies loaning Think3 $193,564, $158,724, $35,238, and $18,976 in the 2009 Loans and was involved in a portion of the $740,715 loaned to Think3 in the 2010 Loans. With respect to Defendant Perry, Plaintiff Trust alleges that he was responsible for his company loaning $593,495 in the 2009 Loans and was involved in a portion of the $740,715 loaned to Think3 in the 2010 Loans. *See* Complaint ¶¶ 29–31.

Providing all reasonable inferences to Plaintiff Trust in the context of Rule 12(b)(6), the Court concludes that there is a plausible claim under Count 1 of the Complaint that the Director Defendants Costello, Kaufman, and Perry breached their

fiduciary duty of loyalty. The 2009 Loans and 2010 Loans are alleged to be self-dealing transactions between these Director Defendants and Think3 without an independent approval from disinterested directors or shareholders, and the presumption of business judgment does not apply.

These transactions with respect to the 2009 Loans and 2010 Loans are alleged to be examples of classic "self-dealing"—where a fiduciary is on both sides of the transaction. *See Cede*, 634 A.2d at 362. Defendant Costello allegedly was making secured loans directly between Think3 and himself. Defendants Kaufman and Perry both allegedly made secured loans between Think3 and the companies that they controlled. Contrary to Defendants' assertions, it is not fatal that the Complaint fails to allege whether these Director Defendants received payments on the loans. The Complaint alleges that the making of secured loans (as opposed to equity transactions) to Think3 by these Directors was unprecedented, and that the existence of these secured loans prevented Think3 from finding a suitor to purchase the company, leading to further financial distress. These allegations make it plausible that Think3 suffered harm as a result of these Director Defendants' alleged breach of the fiduciary duty of loyalty.

For these reasons, the request for dismissal under Rule 12(b)(6) of Count 1 based on breach of the duty of loyalty by Director Defendants Costello, Kaufman, and Perry must be denied.

### 2. Director Defendant Zuccarello

The Complaint also alleges that Defendant Zuccarello (who was a Director and Chief Executive Officer of Think3) breached his duty of loyalty to Think3.

The Court concludes that there is a plausible claim under Count 1 that Defendant Zuccarello violated his fiduciary duty of loyalty to Think3. Similar to the other Director Defendants, the Complaint alleges that Defendant Zuccarello engaged in self-dealing with respect to the 2009 Loans. Defendant Zuccarello allegedly engaged in self-dealing by directly negotiating the 2009 Loans with Think3 without approval from a disinterested board or shareholders and while Defendant Zuccarello was on both sides of the transaction. Plaintiff Trust alleges that Defendant Zuccarello received a promissory note in the amount of $127,500 from Think3 as part of the 2009 Loans secured by assets of Think3, even though Defendant Zuccarello never funded the loan. In addition, the Complaint alleges that in 2010, Defendant Zuccarello received New Notes that more than doubled Think3's debt obligations to him from $127,500 to $279,303 at 15% interest, along with security interests and a Mandatory Prepayment Agreement which specifically directed that money owed to Think3 would be paid to Defendant Zuccarello. *See* Complaint ¶¶ 28–37.

The Complaint also alleges that Defendant Zuccarello's loans and other Side Agreements with Think3 were also not approved by a disinterested board or informed stockholder consent. According to the Complaint, the written consent of the Think3

stockholders did not reflect that that Defendant Zuccarello would receive increases in the amount of the New Notes. In addition, the Complaint alleges that the stockholders were not informed that (1) the New Notes would be secured by assets of Think3; (2) the New Notes were being assumed by the surviving corporation; and (3) of the Master Prepayment Agreement which directed payments specifically to Defendant Zuccarello. *See* Complaint ¶ 39.

For these reasons, the request for dismissal under Rule 12(b)(6) of Count 1 based on breach of the duty of loyalty by Defendant Zuccarello must be denied.

### 3. Defendant Giudici

Although Defendant Giudici was only an officer (and not a director) of Think3, he still may be held accountable for breach of a fiduciary duty of loyalty as a result of self-dealing. Under Delaware law, both corporate directors and officers are corporate fiduciaries who "are not permitted to use their position of trust and confidence to further their private interest." *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 252 (Del. Ch. 2014) (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

Providing all reasonable inferences to Plaintiff Trust in the context of Rule 12(b)(6), there is a plausible claim under Count 1 that Defendant Giudici violated his fiduciary duty of loyalty to Think3. Plaintiff Trust alleges that Defendant Giudici received a promissory note in the amount of $45,000 from Think3 as part of the 2009 Loans secured by assets of Think3, even though Defendant Giudici never funded the loan. In a similar fashion to Defendant Zuccarello, in 2010 Defendant Giudici allegedly received New Notes that more than doubled Think3's debt obligations to him from $45,000 to $99,437, along with security interests and a Mandatory Prepayment Agreement which specifically directed that money owed to Think3 would be paid to Defendant Giudici. *See* Complaint ¶¶ 28–37.

The Complaint alleges that Defendant Giudici arranged for the payments to be made on his New Notes while he was still the Chief Operating Officer with Think3. In addition, the Complaint alleges that Defendant Giudici was the beneficiary of a Master Prepayment Agreement that specially diverted payments from Think3 towards his loans. It is alleged that these transactions by Think3 with Defendant Giudici were not approved by a disinterested board or by informed shareholders. *See* Complaint ¶¶ 36–39.

According to the Complaint, the written consent of the Think3 stockholders did not reflect that that Defendant Giudici would receive increases in the amount of the New Notes. In addition, the Complaint alleges that the stockholders were not informed that (1) the New Notes would be secured by assets of Think3; (2) the New Notes were being assumed by the surviving corporation; and (3) of the Master Prepayment Agreement which directed payments specifically to Defendant Giudici. *See* Complaint ¶ 39.

For these reasons, the request for dismissal under Rule 12(b)(6) of Count 1 based on breach of the duty of loyalty by Defendant Giudici must be denied.

### C. Duty of Good Faith/*Caremark* Claims

Count 1 of the Complaint also alleges a breach of the duty of good faith by all the Defendants, including acting in bad faith. *See* Complaint ¶¶ 43–47.

Under Delaware law, the duty of good faith used to be considered a standalone fiduciary duty, along with the duty of care and duty of loyalty. *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). As a result of more recent Delaware jurisprudence, the fiduciary duty of good faith has now developed into a subset of the duty of loyalty. *See Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64–67 (Del. 2006). As a result, the failure to act in good faith indirectly results in liability as breach of the duty of loyalty. *Stone*, 911 A.2d at 370. For the purposes of this Opinion, the Court will analyze and address the duty of good faith separately, while recognizing it is encompassed in the duty of loyalty.

The failure to act in good faith is qualitatively different from the duty of care or duty of loyalty. *Stone*, 911 A.2d at 369; *In re Citigroup Inc.* S'holders *Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (noting that the burden to show bad faith is "even higher" than the burden to rebut the business judgment rule presumption). The duty of care and duty of loyalty relate to a fiduciary's conduct; whereas, the duty of good faith relate to a fiduciary's state of mind to act within the best interests of the corporation and its shareholders. *Disney*, 906 A.2d at 67 (stating that all director actions require a "true faithfulness and devotion" to the corporation).

While the Delaware Supreme Court has declined to create a "definitive and categorical definition of the universe of acts that would constitute bad faith," there are two main categories that have been identified which exhibit a failure to act in good faith. *Disney*, 906 A.2d at 67. First, "subjective bad faith," which is referred to as "fiduciary conduct motivated by an actual intent to do harm," violates the duty of good faith. *Disney*, 906 A.2d at 64. Second, conduct that can be classified as an "intentional dereliction of duty" or "a conscious disregard for one's responsibilities" violates the duty of good faith. *Disney*, 906 A.2d at 66–67 (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)). The second category, involving an intentional failure to act in the face of a known duty to act, encapsulates what is currently known to be *Caremark* claims or "oversight" liability claims. *Stone*, 911 A.2d at 369 (stating that the "*Caremark* standard for so-called 'oversight' liability draws heavily upon the concept of director failure to act in good faith").

Initially, *Caremark* claims resulted from the failure of a board to monitor "illegal conduct" of its employees. In *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996), the case from which *Caremark* claims derive their name, the plaintiffs alleged that the director defendants failed to monitor their employees who were engaged in unlawful sales tactics. *Caremark*, 698 A.2d at 961–64. Although the plaintiffs raised a legitimate cause of action, the court noted that a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a

judgment." *Caremark*, 698 A.2d at 967. As a result of certain safeguards that the directors attempted to create within the company, the plaintiffs in *Caremark* were ultimately unsuccessful in their suit. *Caremark*, 698 A.2d at 970.

For a plaintiff to recover on a *Caremark* claim, it must be shown that: (1) the directors "utterly failed to implement any reporting or information system or control"; or (2) having implemented such a system or controls, the directors "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. One of the more challenging aspects for plaintiffs is that it must be proven that directors have "scienter" or knowledge of the inadequate monitoring systems that were in place. *See In re American Int'l Group, Inc.*, 965 A.2d 763, 799 (Del. Ch. 2009) (finding that the defendants were allegedly "conscious of the fact that they were not doing their jobs"). In proving knowledge, a plaintiff may point to certain "red flags" that should have alerted directors to potential problems within a company. *See, e.g.*, *Citigroup*, 964 A.2d at 135 (Del. Ch. 2009); *David B. Shaev Profit Sharing Account v. Armstrong, C.A.*, 2006 WL 391931, at *5 (Del. Ch. February 13, 2006).

In a "bit of a twist," plaintiffs have recently attempted to expand *Caremark* claims from a duty to monitor illegal conduct to a duty to monitor "business risk." *Reed v. Linehan (In re Soporex)*, 463 B.R. 344, 371 (Bankr. N.D. Tex. 2011). In *In re Citigroup Inc. Deriv. Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009), plaintiffs sued the Citigroup directors for failing to monitor the business risk posed by the subprime mortgage crisis. In *Citigroup*, plaintiffs alleged that Citigroup's directors knowingly failed to protect Citigroup from the subprime crisis by ignoring market-based "red flags." *Citigroup*, 964 A.2d at 114–15. The Delaware Chancery Court, however, found that the plaintiffs at most alleged that the directors made "bad business decisions." *Citigroup*, A.2d at 128. The mere presence of negative signs in the housing market was not enough to overcome the protections of the business judgment rule, according to the Delaware Chancery Court in *Citigroup*. *See Citigroup*, 964 A.2d at 130.

Despite the Defendants' arguments to the contrary, the Delaware Chancery Court in *Citigroup* did not expressly indicate that *Caremark* claims were limited to monitoring illegal conduct. Indeed, subsequent to the *Citigroup* decision, the Delaware Chancery Court has recognized that a claim against directors for failure to monitor "business risk" is a theoretical possibility, but that such a claim would be difficult to prevail upon. *See In re Goldman Sachs Group, Inc. S'holder Litig.*, 2011 WL 4826104, at *22 n.217 (Del. Ch. October 12, 2011). Accordingly, interpreting Delaware law, this Court finds that directors may theoretically be liable for a *Caremark* claim for failure to monitor business risk, while recognizing that this type of claim is very difficult to prove.

### 1. Director Defendants Zuccarello, Costello, Kaufman, and Perry

While acknowledging that a breach of the duty of good faith and a *Caremark* claim is among the most difficult fiduciary claims to prove under Delaware law, the Court concludes that in the context of Rule 12(b)(6), Plaintiff Trust has plausibly alleged that

the Director Defendants (Zuccarello, Costello, Kaufmann and Perry) have violated their duty of good faith. Here, according to Plaintiff Trust's factual allegations in the Complaint and reasonable inferences therefrom, the Director Defendants violated their duty of good faith for their sustained and systemic failure to exercise oversight, to understand, consider, and prepare for the massive Italian Tax Liability. *See* Complaint ¶ 44(iv).

Unlike the *Citigroup* case (which the Defendants heavily rely on), Plaintiff Trust's Complaint does not present a situation where the Director Defendants failed "to predict the future and to properly evaluate business risk." *Citigroup*, 964 A.2d at 131. Instead, the alleged intentional failure to act in the face of a "known duty to act" is demonstrated through the allegations that the Director Defendants failed to monitor one of life's greatest certainties—taxes.

According to the Complaint, it was only in mid-2010, that the Director Defendants began to consider seriously the Italian Tax Liability—which was a short period of time before Think3 filed for bankruptcy. The Complaint alleges that the Italian Tax Liability was growing at $3 million a year, the Board did not hold regular meetings, the Board was not tracking the liability, the Board did not consult experts as to how the Board should handle the massive Italian Tax Liability until mid-2010, and the Board never maintained audited financial statements. *See* Complaint ¶ 24. Moreover, considering that the Italian Tax Liability was growing and was allegedly $23 million or the majority of all Think3's liabilities, it is plausible that the Director Defendants utterly failed in their responsibility to monitor the Italian Tax Liability. *See Rich v. Yu Kwai Chong*, 66 A.3d 963, 983–84 (Del. Ch. 2013) (finding that plaintiffs sufficiently alleged a *Caremark* claim, in part, because of the directors "woefully inadequate" recordkeeping system). Drawing reasonable inferences from the allegations in the Complaint, it is plausible that the Director Defendants utterly failed to implement any reporting or information system or control over the mounting Italian Tax Liability. It is also plausible that the Director Defendants consciously failed to monitor and oversee Think3's operations thus disabling themselves from being informed of the Italian Tax Liability problem, which required their attention. *See Stone*, 911 A.2d at 370.

The Complaint also alleges that the "Board (consisting of the Director Defendants) manipulated the financial statements of the company and certain transactions" to improve its Italian operations which may have increased the Italian Tax Liability. *See* Complaint ¶ 24 n.9. This allegation (if true) could plausibly support a finding that the Director Defendants violated the duty of good faith. *See Disney*, 906 A.2d at 64 (stating that "subjective bad faith" is axiomatic of a claim alleging the duty of good faith). Therefore, through allegedly manipulating the Italian Tax Liability, Plaintiff Trust's factual allegations sufficiently allege a breach of the duty of good faith against the Director Defendants.

For these reasons, the request for dismissal under Rule 12(b)(6) of the breach of duty of good faith claims in Count 1 of the Complaint against the Director Defendants (Zuccarello, Costello, Kaufmann and Perry) must be denied.

### 2. Defendant Giudici

On the other hand, the Complaint is bereft of any factual allegations that would support or even reasonably infer a breach of duty of good faith or a *Caremark* claim against Defendant Giudici (who was not a director on the Board of Think3). Plaintiff Trust does not allege that Defendant Giudici was involved with any of the decisions regarding or oversight of the Italian Tax Liability. Instead, the Complaint focuses exclusively on the actions and inactions of the Board (the Director Defendants) with respect to the Italian Tax Liability. *See* Complaint ¶ 24.

For these reasons, Defendant Giudici's request for dismissal under Rule 12(b)(6) of the breach of duty of good faith claims in Count 1 of the Complaint must be granted. And for the same reasons that Plaintiff Trust should not be granted leave to amend its Complaint to replead a breach of the duty of care claim against Defendant Giudici, leave should not be granted to amend the Complaint to replead a breach of duty of good faith claim against Defendant Giudici.

### D. Business Judgment Rule Presumption

The Defendants have understandably sought the protection of the business judgment rule. The business judgment rule is a presumption that acts as a "procedural guide for litigants and a substantive rule of law" to insulate directors from judicial second-guessing. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). The policy rationale for such a presumption is that judges are ill-equipped to make hindsight determinations of business experts. *See In re MFW S'holder's Litig.*, 67 A.3d 496, 526 (Del. Ch. 2013); *see also Dodge v. Ford Motor Co.*, 170 N.W. 668, 684 (Mich. 1919).

Under Delaware substantive law, the "business judgment presumption" is a "rule of evidence that places the initial burden of proof on the plaintiff." *Emerald Partners v. Berlin*, 787 A.2d 85, 90–91 (Del. 2001). Unless a plaintiff demonstrates that the duty of care or duty of loyalty was violated, a court is required to presume that a company's directors and officers acted on an "informed basis, in good faith, and in the honest belief" that the alleged wrongdoings were taken in the best interest of the company. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000). When the business judgment rule applies, liability will result only if the action is proven to lack "any rational business purpose." *Brehm v. Eisner*, 746 A.2d 244, 264 n.65 (Del. 2000) (supporting citations omitted). A business decision lacks rationality when it "is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 n.18 (Del. Ch. 2013). On the other hand, when the business judgment presumption does not apply, the director defendants must demonstrate "fair dealing" and "fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

Although the business judgment rule is used to "defend" corporate actions, a

plaintiff must plead enough factual allegations for a court to plausibly infer that the directors or officers breached their duty of care or duty of loyalty. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 680 (N.D. Tex. 2011) (applying Delaware law) (requiring that a plaintiff "plead around" the business judgment rule to survive a Rule 12(b)(6) motion); *see also Reed v. Linehan (In re Soporex)*, 463 B.R. 344, 376–77 (Bankr. N.D. Tex. 2011) (same); *Notinger v. Costa (In re Robotic Vision Systems, Inc.)*, 374 B.R. 36, 48–49 (Bankr. D.N.H. 2007) (same). Unlike affirmative defenses, a plaintiff bears the burden of rebutting the business judgment rule. *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009). Therefore, Plaintiff Trust must plead sufficient factual allegations in the Complaint that plausibly rebuts the business judgment rule to survive a motion to dismiss under a Rule 12(b)(6) motion by the Defendants.

The Court concludes that in the Rule 12(b)(6) context, and drawing every reasonable inference in favor of Plaintiff Trust, the factual allegations in the Complaint sufficiently rebut the business judgment rule. According to the Complaint, the Director Defendants violated their duty of care through their failure to make an "informed business judgment" with regard to the Italian Tax Liability and the China JV. *See* Complaint ¶¶ 24–26. In addition, for the reasons set forth above, the Complaint also states a plausible claim that the Director Defendants and Defendant Giudici violated their duty of loyalty. In summary, the Complaint alleges that the Defendants entered into a series of interested party transactions with Think3 which amounts to self-dealing without approval from the stockholders or a disinterested Board. *See* Complaint ¶¶ 27–31. Furthermore, as set forth above, Plaintiff Trust has sufficiently alleged a plausible (yet difficult) claim against the Director Defendants for their failure to act in good faith with regard to monitoring the business risk related to the Italian Tax Liability. *See* Complaint ¶ 24.

For these reasons, the Court denies the Defendants' request for dismissal of the Complaint under Rule 12(b)(6) based on the business judgment rule.

## E. Exculpatory Charter Provision-DGCL § 102(b)(7)

The Defendants have also sought dismissal under Rule 12(b)(6) based on an "exculpatory provision" in Think3's certificate of incorporation.[6] Delaware has provided corporations the option to exculpate their directors from liability for breaching their fiduciary duty of care. In this regard, § 102(b)(7) of the Delaware General Corporate Law ("DGCL") provides:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation

---

[6] For the reasons set forth above, the Court may take judicial notice of Think3's certificate of incorporation in the context of a Rule 12(b)(6) motion.

of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). This exculpatory provision essentially provides Delaware corporations with the ability to insulate their directors from breach of duty of care claims. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 65 (Del. 2006). The only requirement is that Delaware corporations must adopt such an exculpatory provision in their certificate of incorporation.

Here, Think3's Sixth Amended and Restated Certificate of Incorporation took advantage of this DGCL § 102(b)(7) by stating:

> To the fullest extent permitted by the General Corporation Law of the State of Delaware as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. *See* Motion (dkt# 20-5) (Exhibit #12).

As a result of this exculpatory provision in Think3's certificate of incorporation, the Director Defendants contend that Plaintiff Trust's breach of fiduciary duty of care claims must be dismissed under Rule 12(b)(6).

The Court rejects the Director Defendants' argument in this regard at the Rule 12(b)(6) stage of this proceeding. Unlike the business judgment rule, DGCL § 102(b)(7) is an affirmative defense, which is not proper for consideration in a Rule 12(b)(6) motion to dismiss. Courts have held that a claim should be dismissed under Rule 12(b)(6) only when the affirmative defense is clearly applicable on the face of a complaint. *See, e.g., EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006). Federal courts in Delaware, interpreting Delaware law, have also held that corporate directors who assert an exculpatory provision defense under DGCL § 102(b)(7) are raising an "affirmative defense," and therefore, those corporate directors cannot obtain dismissal of duty of care claims under Rule 12(b)(6). *See, e.g., Burtch v. Opus, L.L.C. (In re Opus East, L.L.C.)*, 480 B.R. 561, 572 (Bankr. D. Del. 2012); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 561 n.112 (Bankr. D. Del. 2012); *Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008); *Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*, 368 B.R. 394, 401 (Bankr. D. Del 2007).[7]

---

[7] Even accepting the Defendants' proposition that DGCL § 102(b)(7) is not an affirmative defense, the portion of the Director Defendant's motion to dismiss that seeks to dismiss the duty of care claims based on the DGCL § 102(b)(7) defense should still be denied. Other courts, including Delaware state courts, have held that a duty of care claim may not be dismissed under Rule 12(b)(6) based on a DGCL § 102(b)(7) defense when a plaintiff has sufficiently alleged a breach of duty of loyalty claim. *See* Bridgeport Holdings Inc. Liquidation Trust v. Boyer *(In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008); *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001). Here, Plaintiff Trust has properly and sufficiently alleged a breach of duty of loyalty claim against the Defendants, as set forth above.

In this regard, the Delaware bankruptcy courts have placed much reliance on the Third Circuit decision in *Stanziale v. Nachtomi* (*In re Air Tower*), 416 F.3d 229, 242 (3d Cir. 2005). Likewise, this Court finds the *Air Tower* opinion persuasive. There, the Third Circuit stated that "an exculpatory provision appears to be in the nature of an affirmative defense". *Air Tower*, 416 F.3d at 242. While this statement by the Third Circuit may not be binding authority, there are ample reasons to categorize the DGCL § 102(b)(7) defense as an affirmative defense. First, the Director Defendants bear the burden of proof in establishing that DGCL § 102(b)(7) exculpates them from liability. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1223–24 (Del. 2009). Second, the DGCL § 102(b)(7) defense bears a resemblance to the non-exhaustive list of Rule 8(c)(1) affirmative defenses, particularly releases or waivers. Third, the DGCL § 102(b)(7) defense raises new legal theories that are separate from the underlying duty of care claims. *See Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 546 (6th Cir. 1986) (providing a two-part test to define an affirmative defense). For Plaintiff Trust to make out a *prima facie* case against the Defendants for breaching their duty of care, the DGCL § 102(b)(7) defense need not be overcome.

The Director Defendants counter that Delaware state courts frequently dismiss duty of care claims based on a DGCL § 102(b)(7) exculpatory defense at the motion to dismiss stage of a suit. *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001). Yet, those Delaware courts were interpreting Delaware state procedural rules. The Director Defendants incorrectly assume that Delaware's procedural rules concerning a motion to dismiss are equivalent to the Federal Rules of Civil Procedure. As the Third Circuit stated, "Delaware cases are legion requiring specific allegations of fact to support a plaintiff's demand for relief under Chancery Rule 8." *Tower Air*, 416 F.3d at 236; *see also Notinger v. Costa (In re Robotic Vision Systems, Inc.)*, 374 B.R. 36, 44 (Bankr. D.N.H. 2007) (recognizing that the federal pleading standard is a "less stringent standard" than the Delaware pleading standard). Relying on Delaware state court decisions, which interpret state procedural law, would also run afoul of the general proposition that federal courts are to apply state substantive law and federal procedural law. *See, e.g.*, *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).

Accordingly, the breach of duty of care claims against the Defendants will not be dismissed on the basis of the DGCL § 102(b)(7) exculpatory provision defense at this Rule 12(b)(6) stage of this suit.[8]

## F. **Bangor Punta Doctrine**

The Defendants have also sought dismissal under Rule 12(b)(6) of Counts 1 and

---

[8] This ruling in the Rule 12(b)(6) context has no bearing on the ultimate outcome of the Defendants' DGCL § 102(b)(7) defense to the breach of duty of care claims, which appears quite strong. Yet, the purpose of a Rule 12(b)(6) motion to dismiss is to weigh the legal sufficiency of a complaint. A Rule 12(b)(6) motion does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of the defenses." *Campbell v. Cathcart (In re Derivium Capital, LLC)*, 380 B.R. 407, 416 (Bankr. D.S.C. 2006).

2 of Plaintiff Trust's Complaint based on the *Bangor Punta* doctrine. Specifically, Defendants argue that the post-merger Think3 could not have brought this suit pre-bankruptcy under the *Bangor Punta* doctrine, and therefore, Plaintiff Trust does not have standing to bring this suit under § 541(a) of the Bankruptcy Code.

Defendants' request for dismissal under Rule 12(b)(6) based on the *Bangor Punta* doctrine fails for multiple reasons.

First, the *Bangor Punta* doctrine is an equitable doctrine that prevents shareholders who acquire a substantial interest in a company from recovering against prior management and shareholders for corporate waste that occurred *prior to* their purchase. *See Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 714–17 (1974). The doctrine is based on the principle that such a result would create an "unjust enrichment" to or a "windfall" for the new shareholders. *Bangor Punta*, 417 U.S. at 716*.* In *Bangor Punta*, the current shareholders of a corporation who bought over 99% of the corporation were suing the former owners for corporate mismanagement in a non-bankruptcy proceeding. *Bangor Punta*, 417 U.S. at 705–06. In *Bangor Punta*, the suit alleged damages of $7 million, but the shareholders only spent $5 million to buy 99% of the company, potentially creating an enormous windfall for the current shareholders. *Bangor Punta*, 417 U.S. at 716. Here, in contrast, any recovery by Plaintiff Trust will be for the benefit of Think3's creditors and will not result in a windfall for Think3's current shareholders, as discussed below.

Second, the *Bangor Punta* doctrine is not applicable in bankruptcy proceedings brought for the benefit of creditors. The Supreme Court in *Bangor Punta* indicated that the doctrine does not apply to actions that are brought "on behalf of any creditors." *Bangor Punta*, 417 U.S. at 718 n.15. In bankruptcy and insolvency proceedings, courts have found that the unjust enrichment rationale of *Bangor Punta* is inapplicable. *See Meyers v. Moody*, 693 F.2d 1196, 1207 (5th Cir. 1982) (recognizing that the *Bangor Punta* doctrine was not applicable to suit brought by receiver of insolvent insurance company for the benefit of creditors); *KSC Recovery, Inc. v. The First Boston Corporation (In re Kaiser Merger Litig.)*, 168 B.R. 991, 1004 (D. Colo. 1994) (*Bangor Punta* doctrine inapplicable to suit brought in bankruptcy proceeding on behalf of debtor corporation). Put more simply, courts have stated that the *Bangor Punta* doctrine has "no relevance" in bankruptcy proceedings. *Brandt v. Hicks, Muse & Co. (In re Healthco, Inc.)*, 195 B.R. 971, 986 (Bankr. D. Mass. 1996); *see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox, Inc.)*, 503 B.R. 239, 332 (Bankr. S.D.N.Y. 2013).

Here, Plaintiff Trust was created by a confirmed plan of reorganization in the Think3 bankruptcy case for the purpose of bringing suits for the benefit of creditors of insolvent Think3. *See* Complaint ¶¶ 3, 13 (dkt#1). The confirmed plan created Plaintiff Trust and approved the Litigation Trust Agreement that governs Plaintiff Trust (case no. 11-11252, dkt# 533, p. 73–104). Section 2.2 of the Litigation Trust Agreement provides that Plaintiff Trust was created for the benefit of creditors, as it states in relevant part:

The purposes of the [Plaintiff] Trust are as follows, and the [Plaintiff] Trust shall have no other purpose or activities:

(a) to marshal, liquidate, and distribute the Litigation Trust Assets in an expeditious but orderly manner;

(b) to perform the functions and take the actions provided for or permitted by the Plan, this [Plaintiff] Trust Agreement and in any other agreement executed by the [Plaintiff] Trustee for the [Plaintiff] Trust pursuant to the Plan;

(c) to investigate, prosecute, settle, or abandon the [Plaintiff] Trust Avoidance Actions, the Litigation Trust D&O Claims, the Italian Claims, and the Rights of Action assigned to the [Plaintiff] Trust under the Plan as [Plaintiff] Trust Assets and to distribute the proceeds of any recoveries therefrom in accordance with the terms of the Plan and this [Plaintiff] Trust Agreement; and

(d) *to make Distributions to the holders of Allowed General Unsecured Claims in accordance with the Plan.* (*emphasis added*).

Providing every reasonable inference to Plaintiff Trust in the Rule 12(b)(6) context, the *Bangor Punta* doctrine is inapplicable to this suit. Plaintiff Trust is required to make distributions to the creditors of Think3. The distribution to Think3's creditors readily distinguishes this suit from the Supreme Court's decision in *Bangor Punta*.

Third, the *Bangor Punta* doctrine is an equitable doctrine based on unjust enrichment, and cannot be applied without considering the facts and equities of an individual case—which would not be proper in the Rule 12(b)(6) context. *See Bangor Punta*, 417 U.S. at 714–17. A Rule 12(b)(6) motion is not proper for resolving fact-based contests regarding the merits of a claim. *See, e.g., Campbell v. Cathcart (In re Derivium Capital, LLC)*, 380 B.R. 407, 416 (Bankr. D.S.C. 2006).

Fourth, the *Bangor Punta* doctrine is an affirmative defense. As such, it is not the proper subject of a Rule 12(b)(6) motion to dismiss. *See, e.g., EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006) (finding that an affirmative defense is not a proper basis to dismiss a complaint on a Rule 12(b)(6) motion); *Meyers*, 693 F.2d at 1207 (analyzing the *Bangor Punta* doctrine as the affirmative defense of "equitable estoppel").

For any and all of these reasons, the Court denies the Defendants' request for dismissal of the Complaint under Rule 12(b)(6) based on the *Bangor Punta* doctrine.

## G. Conclusion-Count 1 and Count 2

In conclusion, the request by the Director Defendants (Defendants Zuccarello, Costello, Kaufmann and Perry) for dismissal of Count 1 (breach of fiduciary duties of

28

care, loyalty and good faith) and Count 2 (gross negligence) under Rule 12(b)(6) is denied. The request for dismissal by Defendant Giudici of Count 1 (as to breach of the fiduciary duties of care and good faith only) and Count 2 (gross negligence) under Rule 12(b)(6) is granted.  The request for dismissal by Defendant Giudici of Count 1 (as to breach of the fiduciary duty of loyalty) under Rule 12(b)(6) is denied.

## V.
## FRAUD ON STOCKHOLDERS (Count 3)

Count 3 of the Complaint alleges "fraud on stockholders" of Think3 in connection with the 2010 Merger against the Director Defendants. Plaintiff Trust apparently attempts to assert Count 3 on behalf of the pre-2010 Merger stockholders[9] of Think3 who were allegedly harmed by the Director Defendants' purported misleading statements and omission of material facts in connection with the 2010 Merger. *See* Complaint ¶¶ 51–52.

The Director Defendants seek dismissal of Count 3 under Rule 12(b)(6) contending that Plaintiff Trust has not standing or right to sue for fraud and damages caused to the pre-2010 merger stockholders of Think3.  For the most part, the Court agrees with these contentions of the Director Defendants.

Plaintiff Trust lacks standing to bring claims against the Director Defendants for injury to and damages allegedly suffered by the pre-2010 merger stockholders of Think3. Under § 541(a)(1) of the Bankruptcy Code, property of the bankruptcy estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." This includes any causes of action belonging to the debtor (here Think3) at the time of the commencement of the bankruptcy case. *See, e.g., Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013). But property of the bankruptcy estate does not include claims for damages caused to individual creditors or stockholders of the debtor. *See, e.g., Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 433 (1972) (bankruptcy trustee has no standing to sue for damages on behalf of debenture creditors of debtor under Bankruptcy Act); *Schertz-Cibolo-Universal City v. Wright* (*In re Educators Group Health Trust*), 25 F.3d 1281, 1284-85 (5th Cir. 1994) (under *Caplin*, if direct injury is caused to the debtor, trustee has standing to bring suit; if direct injury is caused to creditors that is not derivative of harm to the debtor, trustee does not have standing to bring suit).

On the other hand, § 541(a)(1) of the Bankruptcy Code does give a trustee standing to bring a cause of action for damages suffered by a debtor corporation against corporate officers and directors for alleged misconduct and breach of fiduciary duties. This is because these types of claims could have been asserted by the debtor corporation or by its stockholders in a corporate derivative action. *See Mixon v. Anderson (In re Ozark Rest. Equip. Co., Inc.)*, 816 F.2d 1222, 1225 (8th Cir. 1987) (citing *Pepper v. Litton*, 308 U.S. 295, 307 (1939)).

---

[9] At the hearing on the Motion, counsel for Plaintiff Trust advised that Count 3 seeks recovery for alleged fraud on the pre-2010 merger shareholders of Think3.

Here, the way in which Count 3 of the Complaint is pled and explained by Plaintiff Trust, Count 3 appears to seek damages for injuries directly suffered by the pre-merger stockholders of Think3. Accordingly, the *Caplin* standing limitation would apply and requires dismissal of Count 3.

However, in Count 1 of the Complaint (breach of fiduciary duties), Plaintiff Trust essentially alleges the same facts as in Count 3. Count 1 clearly alleges that Think3 was damaged by the purported failure to disclose by the Director Defendant.  In this regard, Count 1 alleges that the Defendants "failed to make disclosure to the stockholders of the material facts of the Merger (a transaction in which the Board were interested parties as it involved consideration (e.g., releases, etc.) being provided to them and their entities that participates in the 2009 Loan and the 2010 Loan" and made "misleading statement to stockholders in connection with the Merger". *See* Complaint ¶ 44(vi)–(vii). The Complaint also alleges that the written consent of the Think3 stockholders did not reflect that that Defendants Zuccarello and Giudici would receive increases in the amount of the New Notes in connection with the 2010 Merger. In addition, the Complaint alleges that the stockholders were not informed in connection with the 2010 Merger that (1) the New Notes to Defendants Zuccarello and Giudici would be secured by assets of Think3; (2) the New Notes were being assumed by the surviving corporation; and (3) of the Master Prepayment Agreement which directed payments owed to Think3 specifically to Defendants Zuccarello and Giudici. *See* Complaint ¶ 39. Count 1 alleges that as a direct result of this conduct by the Director Defendants, that Think3 has been damaged. Thus, Count 1 of the Complaint states a plausible claim for damages and injury suffered by Think3 for breach of the "duty of disclosure" by the Director Defendants.

Under Delaware law, a director's "duty of disclosure" is not an independent fiduciary duty; instead it derives from both the "duty of care" and the "duty of loyalty". *See Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009). Here, alleged breach of the duties of care and loyalty are specifically pled by Plaintiff Trust in Count 1 of the Complaint against the Director Defendants.

A director's duty of disclosure is particularly acute for certain shareholder decisions—including whether to vote yes or no on a particular matter or accept merger consideration—and directors have a duty to disclose all material facts concerning the decision. *See Metro Commc'n's Corp. BVI v. Advanced MobileComm Tech. Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004). Directors also have a duty to avoid misleading partial disclosures. *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996). It is well established that directors have a "fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997). An omitted fact is "material" if there is a "substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." *Loudon,* 700 A.2d at 143; *In re Rural Metro Corp.*, 88 A.3d 54, 104 (Del. Ch. 2014). To state a claim for failure to disclose in connection with a request for stockholder action, the elements of reliance, causation, and actual

quantifiable monetary damages need not be shown--instead the essential inquiry is whether the alleged omission or misrepresentation is "material". *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998). Whether disclosures are adequate is a mixed question of fact and law. *See Rural Metro*, 88 A.3d at 104.

Accordingly, to the extent that Plaintiff Trust is seeking to recover damages for injury that Think3 suffered as a result of the alleged breach of the fiduciary duty to disclose by the Director Defendants, Plaintiff Trust has already stated a plausible claim under Count 1 of the Complaint based on breach of fiduciary duties. To the extent that Plaintiff Trust is attempting to recover damages for injury that the pre-merger stockholders of Think3 suffered as a result of the alleged breach of the duty to disclose—which is the manner in which Count 3 is pled—Plaintiff Trust lacks standing to assert such claim and thus Count 3 must be dismissed.

In conclusion, Count 3 of the Complaint must be dismissed for failure to state a claim under Rule 12(b)(6), with such dismissal being without prejudice to the claims in Count 1 of the Complaint.

## VI.
## PREFERENTIAL TRANSFERS (Count 4)

Count 4 of the Complaint seeks recovery of allegedly preferential transfers against Defendant Zuccarello and Defendant Giudici under 11 U.S.C. §§ 544, 547, and 550. *See* Complaint ¶¶ 53–60. Plaintiff Trust alleges that Defendant Zuccarello and Defendant Giudici received significant funds and/or rights to funds or security interests as preferential transfers while they were insiders of Think3. In an effort to receive the benefit of the 1-year "reachback period" for preferences to insiders, Plaintiff Trust alleges that Defendant Zuccarello continued to be a "de facto officer" and "consultant" of Think3 who controlled Think3's Italian operations following his resignation from the Board of Think3 on September 28, 2010. *See* Complaint ¶¶ 19 n.3, 40–41. With regard to Defendant Giudici, Plaintiff Trust makes no specific allegations of his involvement with the Think3 after his resignation on September 28, 2010 as an officer of Think3. *See* Complaint ¶ 19.

In their Motions to dismiss, both Defendants Zuccarello and Giudici argue that Plaintiff Trust failed to sufficiently allege that either were "insiders," and therefore only the 90-day "reachback period" for preferences to non-insiders should apply. In response, Plaintiff Trust argues that Defendants Zuccarello and Giudici "arranged" their preferential transfers while they were insiders of Think3; therefore, the 1-year reach back period for preferences should apply. Plaintiff Trust also argues that Defendants Zuccarello and Giudici remained insiders after their resignations as officers and a director of Think3.

### A. Timing of Events and Gap Period

Before delving further into the alleged preferential transfers, the timing of the events alleged in the Complaint must be examined. A somewhat unique situation is

presented where the insider status of Defendants Zuccarello and Giudici must be evaluated for only about a four and a half month gap period.

Think3 filed its chapter 11 bankruptcy petition on May 18, 2011 ("Petition Date"). Any preferential transfers made within 90 days prior to the Petition Date (in this case, during the period from February 16, 2011 to May 17, 2011) would be recoverable regardless of whether or not these Defendants were insiders during this 90-day "reachback" period. *See* 11 U.S.C. § 547(b)(4)(A). For insiders, the preference period is extended for an additional nine month "reachback" period (from 90 days to 1 year before the Petition Date). *See* 11 U.S.C. § 547(b)(4)(B). So ordinarily, any preferential transfers received between 90 days and 1 year before the Petition Date (in this case, during the period of May 17, 2010 to February 15, 2011) would be recoverable only if a defendant was an insider at the time. But here, it is alleged that Defendant Zuccarello was a director and Chief Executive Officer of Think3, and Defendant Giudici was the Chief Operating Officer of Think3 up until September 28, 2010, when they resigned their director and officer positions as part of the 2010 Merger. *See* Complaint ¶ 19. So up until their September 28, 2010 resignations, Defendants Zuccarello and Giudici were clearly statutory insiders by virtue of their positions as officers and a director of Think3. *See* 11 U.S.C. § 101(31)(B)(i)(ii). As a result, the only questionable period where the insider status of Defendants Zuccarello and Giudici is relevant is from September 29, 2010 to February 15, 2011—about a four and a half month gap period, instead of the ordinary nine month gap period.

## B. Statutory and Non-Statutory Insiders

To begin with, to establish a preference claim under the Bankruptcy Code, requires a transfer of an interest of the debtor in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor; (3) made while the debtor was insolvent; (4) made on or within 90 days before the petition date, or between 90 days and 1 year before the petition date if such creditor at the time of such transfer was an "insider"; and (5) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the Bankruptcy Code. *See* 11 U.S.C. § 547(b).

Relevant here, there are two basic types of "insiders" under the Bankruptcy Code–so called "statutory insiders" and "non-statutory insiders." Section 101(31)(B) provides a list of individuals who may be considered "statutory insiders" of a corporate debtor. Extremely relevant here, this list of "statutory insiders" includes any director or officer of the debtor, such as Defendants Zuccarello and Giudici up until their September 28, 2010 resignations as officers and a director of Think3. *See* 11 U.S.C. § 101(31)(B)(i)(ii). Also relevant here is that a person may be a "statutory insider" if the person is "in control of the debtor," regardless of whether the person holds a position as an officer or director of the debtor. *See* 11 U.S.C. § 101(31)(B)(iii).

There can also be "non-statutory insiders" of a debtor. This is because the plain language of § 101(31) indicates that the statutory list of "insiders" is not exclusive, and a court must flexibly apply the definition on a case-by-case basis. *See, e.g.*, *Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206, 210 (5th 1983); *In re CorrLine Int'l, LLC*, 516 B.R. 106, 157 (Bankr. S.D. Tex. 2014); *In re Borders Group, Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011). Indeed, § 101(31) uses the word "includes," prior to defining the non-exhaustive list of statutory insiders. This manifests Congressional intent that "insiders" may exist who are not specifically listed as part of the statutory definition. *See, e.g.*, *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1276 (10th Cir. 2008); *In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012).

In determining whether a creditor is a "non-statutory insider," the Fifth Circuit generally examines two factors: (1) the closeness of the relationship between the transferee creditor and the debtor; and (2) whether the transactions between the transferee creditor and the debtor were conducted at arms-length. *See Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

In *Holloway*, the Fifth Circuit found that the debtor's ex-wife creditor was a non-statutory insider. As to the first factor, the Fifth Circuit focused on several facts which indicated the closeness of the relationship between the debtor and the ex-wife creditor, including (i) the debtor and creditor had a long and close relationship as they were married for over 20 years; (ii) they maintained frequent contacts; (iii) the debtor wanted to protect the creditor and vice versa; and (iv) the creditor strongly supported the debtor's position. As to the second factor, the Fifth Circuit focused on several facts that indicated the transaction was not at arms-length, including (i) the loans made by the creditor were initially unsecured; (ii) the creditor knew the debtor was insolvent at the time of the loan; (iii) the creditor's loan was not commercially motivated and no prudent lender would have made the loan; and (iv) unusual circumstances followed the loan. *Holloway,* 955 F.2d at 1011–12.

The Court will now apply these legal principles to Defendant Zuccarello's status as an insider of Think3. First, up until his September 28, 2010 resignation as an officer and director of Think3, the Complaint sufficiently alleges that Defendant Zuccarello was a statutory insider by virtue of his position as an officer and director of debtor Think3. *See* Complaint ¶¶ 19, 22.  Second, after September 28, 2010, the Complaint sufficiently and plausibly alleges that Defendant Zuccarello continued to be an "insider" during the four and a half month gap period from September 29, 2010 to February 15, 2011. This is because Plaintiff Trust alleges that Defendant Zuccarello remained "in control" of Think3 after his resignation (thus sufficiently alleging statutory insider status under § 101(31)(B)(iii) of the Bankruptcy Code). In addition, it is alleged that Defendant Zuccarello continued to be a "de facto officer" and "consultant" to Think3 and its Board after his resignation (thus sufficiently alleging "non-statutory insider" status). According to the Complaint, despite resigning from his official positions on September 28, 2010, Defendant Zuccarello continued to maintain an integral role in Think3. Plaintiff Trust alleges that Defendant Zuccarello arranged to make himself a "consultant" to Think3's

post-merger Board, and in this role, Defendant Zuccarello was allegedly paid substantial amounts of money, and remained a "de facto officer" in control of Think3. *See* Complaint ¶¶ 19 n.3, 40–41.

With respect to Defendant Giudici, up until his September 28, 2010 resignation as an officer, the Complaint sufficiently and plausibly alleges that Defendant Giudici was a statutory insider by virtue of his position as an officer of Think3. *See* Complaint ¶¶ 19, 22. However, the Complaint makes no allegations that Defendant Giudici continued to be an "insider" during the four and a half month gap period from September 29, 2010 to February 15, 2011. Plaintiff Trust does not specifically allege in the Complaint that Defendant Giudici was in control of the debtor Think3 or allege facts supporting any "non-statutory insider" status of Defendant Giudici during this gap period of September 29, 2010 to February 15, 2011.

## C. Arranged Transfer Theory

Plaintiff Trust also argues that Defendants Zuccarello and Giudici "arranged" for preferential transfers while they were still officers and a director of the debtor Think3. Accordingly, Plaintiff Trust contends that payments received from those arrangements within 90 days and 1 year of the Petition Date are recoverable as preferences. *See* Complaint ¶¶ 37–38 (alleging that the "New Notes" and "Mandatory Payment Agreement" were executed while these Defendants were still officers and directors of Think3, which "arranged" for preferential payments to be made later on January 7, 2011 after these Defendants' resignations).

Plaintiff Trust's theory is known as the "arranged transfer" approach. Courts are divided as to whether a preference may be recoverable if it is "arranged" while an individual is an insider, but the preferential payment is received later when the individual is not an insider.

Some courts have held that if a preferential payment is "arranged" while a person is an insider and then the payment is actually received later after the person has technically resigned its position as an insider, the payment is still recoverable as an insider preference. *See, e.g.*, *EECO Inc. v. Smedes (In re EECO Inc.)*, 138 B.R. 260, 264 (Bankr. C.D. Ca. 1992); *DeRosa v. Buildex Inc.* (*In re F & S Cent. Mfg. Corp.*), 53 B.R. 842, 849 (Bankr. E.D.N.Y.1985) (following the "arranged transfer" theory, and holding that a creditor who is an insider at the time the transfer of the debtor's property is arranged is considered to be an insider at the time the payment is made).

Other courts, which constitute the more modern weight of authority, have rejected the "arranged transfer" approach. These courts, relying primarily on the plain statutory language of § 547(b)(4)(B), follow the "exact date" approach. Under the exact date approach, a defendant must be an insider on the date the preferential payment is made. *See, e.g.*, *Butler v. Davis Shaw, Inc.*, 72 F.3d 437, 442 (4th Cir. 1996); *Zucker v. Freeman* (*In re Netbank, Inc.)*, 424 B.R. 568, 571 (Bankr. M.D. Fl. 2010).

34

This Court concludes that the "exact date" approach is required by the plain statutory text of 11 U.S.C. § 547(b)(4)(B) and interpretation of Supreme Court precedent, and therefore, rejects the "arranged transfer" approach.

The Court begins "where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). To constitute a preference, § 547(b)(4)(B) of the Bankruptcy Code states in relevant part that a transfer of the debtor's property must be " made . . . between ninety days and one year before the date of the filing of the petition, if such creditor *at the time of such transfer* was an insider." (*emphasis added*). The plain language of the statute is clear and seems to resolve this issue. According to the statute, preferences are judged at the time the *transfer is made*; and the 1-year reachback period applies only if the creditor was an insider *at the time* of the transfer. The statutory language supports the "exact date" approach because it focuses on the defendant's status as an insider at the exact time of such transfer.

The "exact date" approach is also consistent with the 1992 decision of the Supreme Court in *Barnhill v. Johnson*, 503 U.S. 393 (1992). In *Barnhill*, the issue before the Supreme Court was whether a transfer made by check should be deemed to occur on the date the check is presented to the recipient, or on the date the bank honors the check. *Barnhill*, 503 U.S. 394–95. Noting that a "myriad" of events could result in a check being dishonored after receipt, the Supreme Court held that for preferences purposes, a "transfer" occurs only when the check is actually honored by the bank, not when the check is received by the creditor. *Barnhill*, 503 U.S. at 398–400. In the same vein, an "arranged transfer" is not a final event; as there are many hypothetical scenarios that could prevent an arranged transfer from actually occurring. To maintain consistency with the Supreme Court's adoption of a bright-line rule for the date a "transfer" is made for preference purposes, this Court will follow the "exact date" approach and reject the "arranged transfer" approach.

To date, the Fifth Circuit has not resolved the case law divide between the "exact date" and "arranged transfer" approaches. However, this Court's decision to follow the "exact date" approach and reject the "arranged transfer" approach in consistent with the circuits that have addressed the issue and what appears to be the majority of the lower courts. *See, e.g.*, *Butler v. Davis Shaw, Inc.*, 72 F.3d 437, 442 (4th Cir. 1996); *Graham v. Huntington Nat'l Bank (In re Medcorp, Inc.)*, 2014 WL 5573440, at *16 (Bankr. N.D. Ohio October 31, 2014); *Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 344–45 (S.D.N.Y.2013); *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264, 273 (Bankr. E.D. Tenn. 2012); *Zucker v. Freeman* (*In re NetBank, Inc.*), 424 B.R. 568, 570–71 (Bankr. M.D. Fl. 2010); *Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Medical Center),* 429 B.R. 152, 184 (Bankr. D. N.J. 2010); *Terry v. Paschall (In re Paschall),* 403 B.R. 366, 377 (Bankr. E. D. Va.2009).

As a result, Plaintiff Trust's "arranged transfer" theory of liability for recovery of alleged preferential payments to Defendants Zuccarello and Giudici during the four and a half month gap period from September 29, 2010 to February 15, 2011 must be

rejected by the Court. As will be explained however, this is not dispositive as to whether Plaintiff Trust's preference claims should be dismissed under Rule 12(b)(6).

### D. **Defendant Zuccarello**

Moving specifically now to the alleged preferential transfers to Defendant Zuccarello, the Complaint states that Defendant Zuccarello received "significant funds and/or rights to funds or security interests as preferential transfers", including the "New Notes", the "MPA" (Mandatory Prepayment Agreement), the "Side Agreements," the "New Notes/MPA Payments," and the "Other Payments." *See* Complaint ¶ 54.

The "New Notes" are alleged to be received by Defendant Zuccarello on September 28, 2010 (the date of the merger and his resignation) that doubled the amounts allegedly owed to him. The Complaint alleges that the increase in the New Notes was secured by security agreements executed by Think3. *See* Complaint ¶ 35. The Complaint alleges that the New Notes were secured by rights and payable from a "Mandatory Prepayment Agreement," apparently executed at the same time as the New Notes. The Mandatory Prepayment Agreement allegedly provided that debtor Think3 would instruct Toyota to pay Think3's receivable directly to counsel and such funds would be used to pay Defendant Zuccarello on the New Notes. On January 7, 2011, Defendant Zuccarello allegedly received $240,832 in payment on the New Notes as a result of the Mandatory Prepayment Agreement. *See* Complaint ¶¶ 35–37. The Complaint also suggests that certain payments made to Defendant Zuccarello on October 18, 2010 were the result of certain "Side Agreements" negotiated and required by Defendant Zuccarello at the time of the September 28, 2010 merger. *See* Complaint ¶ 41.

Following is a list of the allegedly preferential payments made to Defendant Zuccarello specifically described in the Complaint:

| Date | Amount |
|------|--------|
| 10/18/2010 | $72,576 |
| 11/18/2010 | $22,303 |
| 12/9/2010 | $32,830 |
| 1/7/2011 | $240,832 |
| 2/3/2011 | $23,927 |
| 3/3/2011 | $27,028 |
| 3/14/2011 | $20,000 |

*See* Complaint ¶¶ 37, 41.

As explained by the Court above, the only questionable period where the insider status of Defendant Zuccarello is relevant is from September 29, 2010 to February 15, 2011—about a four and a half month gap. The first five payments set forth in the above chart (on October 18, 2010, November 18, 2010, December 9, 2010, January 7, 2011,

and February 3, 2011) were allegedly made to Defendant Zuccarello as preferences during this gap period. The Court concludes that the Complaint sufficiently and plausibly alleges that Defendant Zuccarello was still an insider during such gap period when these five payments were allegedly received. This is because Plaintiff Trust alleges that Defendant Zuccarello remained "in control" of Think3 after his resignation (thus sufficiently alleging statutory insider status under § 101(31)(B)(iii) of the Bankruptcy Code), as well as alleges that Defendant Zuccarello continued to be a "de facto officer" and "consultant" to Think3 and its Board after his resignation (thus sufficiently alleging "non-statutory insider" status). *See* Complaint ¶¶ 19 n.3, 40–41; and discussion above regarding Statutory and Non-Statutory Insiders.

As to the last two payments set forth in the above chart (on March 3, 2011 and March 14, 2011), they were allegedly made to Defendant Zuccarello within 90 days of the May 18, 2011 Petition Date. So, allegations regarding whether or not Defendant Zuccarello was an insider of the debtor Think3 at the time of these two payments is not necessary to state a claim for a preference. *See* 11 U.S.C. § 547(b)(4)(A).

As to the Mandatory Prepayment Agreement and in the New Notes secured by a security interest in the assets of Think3, according to the Complaint and all reasonable inferences that can be drawn from the Complaint, they were executed on September 28, 2010 in connection with the 2010 Merger. *See* Complaint ¶ 35-37, 41. On that date—September 28, 2010—Defendant Zuccarello was alleged to be an officer (Chief Executive Officer) and director of the debtor Think3, and thus was a statutory insider. Accordingly, to the extent that the Mandatory Prepayment Agreement and security interest granted by Think3 to secure the New Notes on September 28, 2010 are themselves transfers of property of the debtor Think3, the Complaint sufficiently and plausibly states a claim for a preference as such transfers were made within 1 year of the Petition Date and at a time that Defendant Zuccarello was an insider (officer and director) of Think3. *See* 11 U.S.C. § 547(b)(4)(B); 11 U.S.C. § 101(31)(B)(i)(ii) (defining statutory insiders); 11 U.S.C. § 101(54) (defining "transfer" broadly as creating a lien, or directly or indirectly disposing or parting with the debtor's property or an interest in the debtor's property).

For these reasons, Defendant Zuccarello's request for dismissal of Count 4 for recovery of preferential transfers should be denied.

### E. Defendant Giudici

Moving on now to the alleged preferential transfers to Defendant Giudici, the Complaint also alleges that  Defendant Giudici received "significant funds and/or rights to funds or security interests as preferential transfers," including the "New Notes," the "MPA" (Mandatory Prepayment Agreement), and the "New Notes/MPA Payments." *See* Complaint ¶ 54.

Similar to Defendant Zuccarello, the "New Notes" are alleged to have been received by Defendant Giudici on September 28, 2010 (the date of the 2010 Merger and

his resignation as an officer) that doubled the amounts owed to Defendant Giudici. The Complaint also alleges that the New Notes to Defendant Giudici were payable from a "Mandatory Prepayment Agreement," apparently executed at the same time as the New Notes. The Mandatory Prepayment Agreement allegedly provided that debtor Think3 would instruct Toyota to pay Think3's receivable directly to counsel and such funds would be used to pay Defendant Giudici on the New Notes. The Complaint also alleges that   the New Notes were secured by security agreements executed by Think3. *See* Complaint ¶¶ 35–37.

The only monetary payment alleged to be made to Defendant Giudici as a preference was on January 7, 2011, in the amount of $99,437. This single payment is alleged to be on the New Notes and as a result of the Mandatory Prepayment Agreement. *See* Complaint ¶ 37.  But as of January 7, 2011, there are no allegations in the Complaint that Defendant Giudici was an insider of Think3. Instead, the Complaint alleges that Defendant Giudici resigned as an officer of Think3 beforehand on September 28, 2010. *See* Complaint ¶ 19. The Complaint makes no specific allegations that Defendant Giudici continued to be an "insider" after his resignation and during the four and a half month gap period from September 29, 2010 to February 15, 2011 during which the $99,437 payment was allegedly made. As set forth by the Court above, Plaintiff Trust does not allege in the Complaint that Defendant Giudici was in control of the debtor Think3 or any facts supporting "non-statutory insider" status of Defendant Giudici during this gap period when the alleged $99,437 payment was made on January 7, 2011.[10] Further, for the reasons already set forth above, the Court rejects the "arranged transfer" approach—i.e., the theory that because Defendant Giudici "arranged" for the preferential payment while he was an insider of Think3 that it automatically makes the subsequent payment to him while he was not an insider a preference.

This, however, is not fatal to Plaintiff Trust's Complaint to recover preferential transfers from Defendant Giudici given the other facts alleged in the Complaint. The Mandatory Prepayment Agreement secured payment of the New Notes to Defendant Giudici and the increase in the New Notes was secured by a security interest in the assets of Think3, according to the Complaint. This Mandatory Prepayment Agreement and security interest granted by Think3 to secure the increased New Notes were executed on September 28, 2010 in connection with the 2010 Merger, according to the Complaint and reasonable inferences that can be drawn therefrom. *See* Complaint ¶¶ 35-37, 41. And on that date—September 28, 2010—Defendant Giudici was alleged to

---

[10] In its Response to the Motion to Dismiss by Defendant Giudici, Plaintiff Trust suggests that Defendant Giudici was an insider after his September 28, 2010 resignation. See Response, p. 30 n.22 (dkt# 55). However, no allegations supporting such a theory are set forth by Plaintiff Trust in the Complaint. Since such a theory is possible with adequate factual allegations, and Plaintiff Trust requested leave to amend, the Court will grant leave to provide Plaintiff Trust with the opportunity to amend the Complaint to allege sufficient facts that Defendant Giudici was in control of Think3 or was a "non-statutory insider" of Think3 after his resignation on September 28, 2010.

be an officer (Chief Operating Officer) of the debtor Think3, and thus was a statutory insider.

Plaintiff Trust specifically pleads that the transfer of rights to funds by Think3 under the Mandatory Prepayment Agreement and granting of security interests by Think3 to Defendant Giudici to secure the increase in the New Notes in September 2010 were themselves preferential transfers. *See* Complaint ¶ 54. The transfer of rights to property of debtor Think3 (like the alleged transfer of Think3's rights in the Toyota receivable through the Mandatory Prepayment Agreement) and granting of security interests may plausibly constitute "transfers" of Think3's property that are avoidable preferences. *See* 11 U.S.C. § 101(54) (defining "transfer" broadly as creating a lien, or directly or indirectly disposing or parting with the debtor's property or an interest in the debtor's property); *Cullen Center Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1415 (5th Cir. 1997) (definition of "transfer" for purposes of § 547 is comprehensive, broad, and includes every conceivable mode of alienating property); *Cadle Co. v. Sumrall (In re Sumrall)*, 9 F.3d 1547 (5th Cir. 1993) (*per curiam*) (recognizing that granting of a security interest in real property is a preference under § 547 of the Bankruptcy Code); *Braunstein v. Karger (In re Mellon Produce, Inc.)*, 976 F. 2d 71, 74 (1st Cir. 1992) (creation of a security interest in rights to funds of a debtor is itself a preferential transfer if security interest is created during preference period). So, it is plausible that the alleged transfer of rights by Think3 in the Mandatory Prepayment Agreement and granting of security interests to secure the increase in the New Notes to Defendant Giudici are themselves transfers of property of the debtor Think3 avoidable as preferences, as these transfers were allegedly made on September 28, 2010—which is within 1 year of the Petition Date and at a time that Defendant Giudici was still an insider (officer) of Think3. *See* 11 U.S.C. § 547(b)(4)(B); 11 U.S.C. § 101(31)(B)(ii).

Accordingly, the Court concludes that Plaintiff Trust has sufficiently and plausibly alleged that the transfer of rights to Think3 funds through the Mandatory Prepayment Agreement and the granting of security interests by Think3 to Defendant Giudici to secure the increase in the New Notes on September 28, 2010 themselves were avoidable preferential transfers. The Mandatory Prepayment Agreement allegedly provided that debtor Think3 would instruct Toyota to pay Think3's receivable directly to counsel and such funds would be paid to Defendant Giudici on the New Notes. The $99,437 payment made on January 7, 2011 to Defendant Giudici was made as a direct result of the Mandatory Prepayment Agreement and New Notes, according to the Complaint. *See* Complaint ¶¶ 36–37. Under § 550 of the Bankruptcy Code (which is pled by Plaintiff Trust in the Complaint), to the extent that a transfer is avoided as a preference under § 547, the property transferred or the value of the property transferred (here the interests of debtor Think3 in the Toyota receivable allegedly transferred by the Mandatory Prepayment Agreement on September 28, 2010 for the benefit of Defendant Giudici) may plausibly be recovered from a transferee such as Defendant Giudici. *See* 11 U.S.C. § 550(a); *see also* 11 U.S.C. § 551 (transfer or lien avoided as a preference under § 547 is preserved for the benefit of the estate).

As a result, although the $99,437 payment made to Defendant Giudici on January 7, 2011 may itself not be recoverable as a preferential payment under the current Complaint, it is plausible that $99,437 is the value of the interest of the debtor Think3 transferred for the benefit of Defendant Giudici on September 28, 2010 pursuant to the Mandatory Prepayment Agreement which could be recovered by Plaintiff Trust from Defendant Giudici.

For these reasons, Defendant Giudici's request for dismissal of Count 4 for recovery of preferential transfers should be denied.

### F.  Conclusion-Count 4

In conclusion, the request for dismissal under Rule 12(b)(6) of Count 4 of the Complaint (preferential transfers) against Defendant Zuccarello and Defendant Giudici must be denied. Leave of Court will also be granted to provide Plaintiff Trust with the opportunity to amend Count 4 of the Complaint to allege sufficient facts that might support a contention that Defendant Giudici was in control of Think3 or was a "non-statutory insider" of Think3 after his resignation on September 28, 2010.

### VII.
### FRAUDULENT TRANSFERS (Count 5)

Count 5 of the Complaint asserts "actual" and "constructive" fraudulent  transfer claims against Defendant Zuccarello and Defendant Giudici under 11 U.S.C. § 548. *See* Complaint ¶¶ 61–68. In sum, Plaintiff Trust contends that Defendant Zuccarello and Defendant Giudici received significant funds and rights from Think3 under the 2010 New Notes, the Mandatory Prepayment Agreement, the 2009 Loans, and payments during the two years prior to the date of Think3's bankruptcy filing, which constitute recoverable fraudulent transfers.

Defendant Zuccarello and Defendant Giudici contend that the actual fraudulent transfer claims should be dismissed for failure to plead fraud with particularity under Rule 9, and that both the actual and constructive fraudulent transfer claims should be dismissed for failure to state a claim under Rule 12(b)(6).

In general, § 548(a) of the Bankruptcy Code allows a trustee to avoid transfers made and obligations incurred by the debtor before a bankruptcy filing if the transfer or obligation was made with either "actual" fraudulent intent or "constructive" fraudulent intent. *See generally Williams v. Fed. Deposit. Ins. Corp. (In re Positive Health Management)*, 769 F.3d 899, 903 (5th Cir. 2014); 11 U.S.C. § 548(a)(1)(A) (actual fraudulent transfer);     11 U.S.C. § 548(a)(1)(B) (constructive fraudulent transfer).

### A.  Pleading Standard

Although claims for "actual" fraudulent transfers and "constructive" fraudulent transfers both derive from § 548 of the Bankruptcy Code, some courts apply a different

pleading standard to the two types of claims. Some courts have found that allegations of an "actual" fraudulent transfer must satisfy the heightened pleading standard of Rule 9(b); whereas, allegations of a "constructive" fraudulent transfer need only satisfy the notice pleading standard of Rule 8(a). *See, e.g.*, *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 766 (Bankr. S.D.N.Y. 2013); *In re Petters Co., Inc.*, 495 B.R. 887, 916–17 (Bankr. D. Minn. 2013); *AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309, 333 (Bankr. D. Del. 2005). This distinction has been made by these courts because an actual fraudulent transfer claim under § 548(a)(1)(A) is based on the actual intent to defraud creditors; in contrast to a constructive fraudulent transfer claim under § 548(a)(1)(B) which is based on the debtor's financial condition and the sufficiency of the consideration (not actual fraud). *See Petters*, 495 B.R. at 917; *Geltzer*, 504 B.R. at 766.

The Fifth Circuit, however, has not definitively answered the question regarding which pleading standard to apply to fraudulent transfer claims. *See Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (declining to address the issue); *see also Paradigm Air Carriers, Inc. v. Texas Rangers Baseball Partners (In re Texas Rangers Baseball Partners)*, 498 B.R. 679, 711–12 (Bankr. N.D. Tex. 2013) (declining to decide the issue, but finding that Rule 9(b) standard was met in any event).

Out of an abundance of caution, this Court will apply the Rule 9(b) pleading standard (requiring particularity) to Plaintiff Trust's "actual" fraudulent transfer claims, and will apply the Rule 8(a) (notice standard) to Plaintiff Trust's "constructive" fraudulent transfer claims.

Rule 9(b), which is incorporated into Bankruptcy Rule 7009, provides that when alleging fraud, a party must state "with particularity the circumstances constituting fraud." In substance, this means that a party alleging fraud should specify the "who, what, when, where, and how" of the alleged fraud. *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F. 3d 719, 724 (5th Cir. 2003); *Texas Rangers Baseball,* 498 B.R. at 711. But, what constitutes sufficient "particularity" under Rule 9(b) will necessarily differ with the facts of each case. *See Benchmark Electronics,* 343 F. 3d at 724 (supporting citation omitted).

## B. Actual Fraudulent Transfers

Section 548(a)(1)(A) of the Bankruptcy Code, which governs actual fraudulent transfers, allows a trustee to avoid any transfer made or obligation incurred by a debtor with "actual intent to hinder, delay, or defraud" creditors. Because determining a debtor's actual intent is difficult, courts routinely look to so-called "badges of fraud" as circumstantial evidence of a debtor's subjective intent to defraud creditors. The Fifth Circuit also adopted the so-called "badges of fraud" test to determine whether a debtor had actual intent to delay, hinder, or defraud creditors. *See, e.g.*, *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008).

The Fifth Circuit has articulated the following "badges of fraud" in connection with § 548 of the Bankruptcy Code: (1) the lack or inadequacy of consideration received by the debtor; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the debtor–both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt by the debtor; (6) onset of financial difficulties by the debtor; (7) pendency or threat of suits by creditors of the debtor; and (8) the general chronology of events and transactions under inquiry. *See Soza*, 542 F.3d at 1067 (supporting citations omitted).

Generally, more than one badge of fraud must be shown to establish actual fraudulent intent. *See, e.g., Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (supporting citations omitted). Courts typically require the "confluence" of multiple badges of fraud to establish actual fraudulent intent. *See, e.g., Luker v. Eubanks (In re Eubanks)*, 444 B.R. 415, 422–23 (Bankr. E.D. Ark. 2010) (supporting citations omitted). But it is not necessary that all or any one of the badges of fraud be established to support a finding of actual fraudulent intent by the debtor. *See, e.g., Texas Rangers Baseball Partners*, 498 B.R. at 712 (supporting citations omitted); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 370 (S.D. Tex. 2008) (supporting citations omitted).

Applying these standards to the facts of this particular case, the Court concludes that Plaintiff Trust has pled fraud with sufficient particularity to satisfy the Rule 9(b) standard with respect to its "actual" fraudulent transfer claims. Several of the "badges of fraud" articulated by the Fifth Circuit are pled with particularity in the Complaint.  Plaintiff Trust specifically pointed to dates, amounts, and individuals who were involved in the alleged fraudulent transfers with intent to defraud creditors.

According to the Complaint, in 2009, Defendant Zuccarello and Defendant Giudici allegedly received notes from debtor Think3 in the amount of $127,500 and $45,000 respectively, yet they never funded these loans to Think3. At the time, it is alleged that Defendant Zuccarello was the Chief Executive Officer and a director of debtor Think3, and Defendant Giudici was the Chief Operating Officer. On September 28, 2010, while executive officers of Think3 and despite never funding their 2009 Loans, Defendant Zuccarello and Defendant Giudici allegedly received New Notes from Think3 that more than doubled the amounts of Think3's obligations to $279,303 and $115,322 respectively. The Complaint also alleges at the same time and while executive officers of Think3, Defendant Zuccarello and Defendant Giudici obtained a Mandatory Prepayment Agreement which directed Think3 receivables to be paid on these New Notes. Additionally, on January 7, 2011, the Complaint alleges that Defendant Zuccarello and Defendant Giudici received $240,832 and $99,437 respectively as payments that they arranged. *See* Complaint ¶¶ 28, 34–37. These factual allegations sufficiently set forth the "who, what, when, where, and how" of at least three badges of fraud—the lack of consideration received by the debtor Think for the transfers and the obligations, the close relationship between the debtor Think3 and its executive officers

42

Defendants Zuccarello and Giudici, and a series of transactions and conduct between these Defendants and debtor Think3.

Plaintiff Trust also alleges a long history of financial distress by Think3 before, during, and after the time that these transfers and obligations between Think3 and Defendants Zuccarello and Giudici were taking place. In particular, Plaintiff Trust alleged that by 2009 and continuing into 2011, Think3 amassed substantial debt that it was unable to pay, which ultimately forced Think3 into bankruptcy. Think3 allegedly could not pay its major and growing Italian Tax Liability (which was increasing by $3 million per year and by 2009 was approximately $20 million), its workers went on strike, and an insolvency proceeding was commenced in Italy. The Complaint alleges that Think3 lost millions of dollars from 2004 through 2009, that its total losses exceeded $95 million, and that Think3 has been insolvent since at least 2009. *See* Complaint ¶¶ 16–17, 24. These factual allegations sufficiently set forth the "who, what, when, where, and how" or at least two more badges of fraud—the onset of financial difficulties by the debtor Think3 and the financial condition of the debtor Think3 before and after the transactions in question.

For these reasons, the Complaint pleads fraud with sufficient particularity with regard to the "actual" fraudulent transfer claims, to the extent Rule 9(b) applies to such claims. As multiple badges of fraud are sufficiently pled, Count 5 of the Complaint states a plausible claim under § 548(a)(1)(A) of the Bankruptcy Code and should not be dismissed.

## C. <u>Constructive Fraudulent Transfers</u>

Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer made by a debtor or an obligation incurred by a debtor may be avoided as a "constructive" fraudulent transfer. To state a claim for a constructive fraudulent transfer, three elements must be established: (1) the debtor transferred an interest in property or incurred an obligation within two years of the bankruptcy filing date; (2) the debtor received less than a reasonably equivalent exchange for such transfer or obligation; and (3) the debtor was or became insolvent at the time of the transfer or obligation, or was engaged in a business with unreasonable small capital, or intended or believed that the debtor would incur debts beyond the debtor's ability to pay when due, or made such transfer or incurred such obligation for the benefit of an insider under an employment contract and not in the ordinary course of business. *See* 11 U.S.C. § 548(a)(1)(B); s*ee generally, BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994).

Here, Defendants Zuccarello and Giudici seek dismissal of the constructive fraudulent transfer claim, stating that the Complaint fails to allege facts to support the second and third elements—lack of reasonable equivalent value and Think3's financial condition. *See* Motions, pp. 42-43 (dkt# 54-1), pp. 47-48 (dkt# 62-1). In this regard, these Defendants agree that the short and plain statement pleading standard of Rule 8 applies to the constructive fraudulent transfer claims.

With regard to the first element, there is and can be no dispute that Plaintiff Trust has sufficiently alleged that the debtor Think3 "transferred property" (in the form of making payments to and granting security interests and rights in its property) and "incurred obligations" (in the form of the 2009 Loans and New Notes) to Defendant Zuccarello and Defendant Giudici within two years prior to Think3's bankruptcy filing.

With regard to the second element, the phrase "reasonably equivalent value" is not defined in the Bankruptcy Code. *See Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990). Many courts have adopted a two-step process to determine whether reasonably equivalent value has been provided. First, a court determines whether the debtor received an economic benefit at the time of the transfers or obligations. *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993); *Brandt v. Charter Airlines, LLC (In re Equipment Acquisitions, Inc.)*, 511 B.R. 527, 534 (Bankr. N.D. Ill. 2014). Second, the value provided must be "reasonably equivalent" to what was received by the debtor. *See Equipment Acquisitions*, 511 B.R. at 534–35. The second inquiry of valuation is more difficult and is "inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter the challenged transaction." *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000).

Here, Plaintiff Trust has sufficiently alleged that Defendant Zuccarello and Defendant Giudici provided less than reasonably equivalent value to Think3 in exchange for the transfers of property and obligations incurred by Think3. With regard to the 2009 Loans, according to the Complaint, Defendant Zuccarello and Defendant Giudici received notes from Think3 in the amount of $125,000 and $45,000 respectively, but allegedly failed to fund those notes. With Think3's merger in September 2010, Defendant Zuccarello and Defendant Giudici allegedly received New Notes from Think3 in the amount of $279,303 and $115,322, doubling the amounts of the notes without consideration. In addition, the Complaint alleges that Think3 granted security interests and transferred rights in property for the benefit of these Defendants through the Mandatory Prepayment Agreement and in connection with the New Notes, and payments were made to these Defendants on the New Notes. *See* Complaint ¶¶ 28, 35–37. Plaintiff Trust specifically alleges that that these Defendants obtained repayment of money never actually loaned to Think3, and as a result, Think3 received less than reasonably equivalent value in exchange for the transfers and obligations. *See* Complaint ¶¶ 62, 64. Assuming the facts pled are true and providing Plaintiff Trust with every reasonable inference (as required in the Rule 12(b)(6) context), Plaintiff Trust has sufficient alleged that Think3 received less than reasonable equivalent value in exchange for the transfers made and obligations incurred by Think3 to Defendants Zuccarello and Giudici.

With regard to the third element, the Bankruptcy Code defines "insolvency" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32). Here, Plaintiff Trust sufficiently alleged facts making it plausible that Think3 was insolvent at the time of the

alleged fraudulent transfers and obligations to Defendants Zuccarello and Giudici during the time period of 2009 through 2011. According to the Complaint, Think3 lost over $40 million from 2004 through 2009 and its total losses exceed $95 million. Plaintiff Trust specifically alleges that Think3 had been insolvent for several years (since at least 2009) and could not pay its debts as they became due. The Complaint is rife with allegations of the mounting Italian Tax Liability from 2005 through 2011 (increasing at the clip of about $3 million per year and totaling about $23 million), workers going on strike due to non-payment of wages, an Italian insolvency proceeding in early 2011, and the continual severe financial distress of Think3. *See* Complaint ¶¶ 16–19, 24, 31, 65–67. Assuming the facts pled are true and providing Plaintiff Trust with every reasonable inference (as required in the Rule 12(b)(6) context), Plaintiff Trust has sufficiently alleged facts making it plausible that Think3 was insolvent at the time of the challenged transactions.

For these reasons, the Complaint alleges sufficient facts and a plausible claim for constructive fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code against Defendant Zuccarello and Defendant Giudici.

### D. Conclusion-Count 5

In conclusion, the request for dismissal by Defendant Zuccarello and Defendant Giudici under Rule 9 and Rule 12(b)(6) of the actual and constructive fraudulent transfer claims set forth in Count 5 must be denied.

## VIII.
## BREACH OF CONTRACT (Count 6)

Count 6 of the Complaint alleges a breach of contract claim against only Defendant Zuccarello. In short, Plaintiff Trust alleges that Defendant Zuccarello executed a promissory note to Think3, which has matured and not been repaid. *See* Complaint ¶ 70.

Defendant Zuccarello seeks dismissal of Count 6 under Rule 12(b)(6) on the basis that Plaintiff Trust lacks standing to pursue this cause of action, due to the failure to have a "specific and unequivocal reservation" of this particular cause of action in Think3's chapter 11 plan of reorganization or disclosure statement.

Section 1123(b)(3) of the Bankruptcy Code permits a liquidating trustee, as a representative of the bankruptcy estate, to retain and pursue causes of action that belonged to the debtor or the bankruptcy estate before plan confirmation. *See McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995). Through a reservation of rights in either a disclosure statement or plan of reorganization, a debtor may effectively "pass the baton" to another party (such as a liquidating trustee) who may pursue estate causes of action for the benefit of creditors. *See, e.g., Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.)*,

647 F.3d 547, 550–51 (5th Cir. 2011); *In re Texas Rangers Baseball Partners*, 2014 WL 5100110, at *28 (Bankr. N.D. Tex. October 10, 2014).

However, for an estate representative to have standing to pursue the reserved causes of action, the reservation of the rights and causes of action retained must be "specific and unequivocal" to put creditors on notice of any claim or cause of action that the estate representative wishes to pursue post-confirmation.  *See Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008); *see also Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013); *Compton v. Anderson (In re MPF Holdings LLC)*, 701 F.3d 449, 454 (5th Cir. 2012); *Tex. Wyo. Drilling*, 647 F.3d at 550.

There has been considerable jurisprudence, at both the Fifth Circuit level and bankruptcy court level, over the "specific and unequivocal" standard for reserving claims and causes of action. Some guiding principles have emerged. First, a simple blanket reservation of any and all claims and causes of action known or unknown--without more--is insufficient under the Fifth Circuit "specific and unequivocal" standard. *SI Restructuring*, 714 F.3d at 865; *United Operating,* 540 F.3d at 355–56. Second, to be effective, a reservation of rights does not have to name the intended individual defendants who will be sued. *See MPF Holdings*, 701 F.3d at 455. Third, an effective reservation of rights does not require a statement that a suit will be brought. *See MPF Holdings*, 701 F.3d at 455.  Fourth, the determination of whether a plan reservation of rights meets the Fifth Circuit "specific and unequivocal" standard is governed by traditional rules of contractual interpretation. *See Tex. Gen. Petroleum,* 52 F.3d at 1335.

Applying these guiding principles, the Court concludes that the reservation of rights and claims in the confirmed Think3 Plan and Disclosure Statement was sufficiently "specific and unequivocal" to retain and preserve this breach of contract for debt claim brought by Plaintiff Trust against Defendant Zuccarello in Count 6 of the Complaint.

To begin, section 6.7 of the confirmed Think3 Plan provides that Plaintiff Trust "shall have and retain the sole and full power, authority, and standing to prosecute, compromise, or otherwise resolve the Litigation Trust Avoidance Actions, the Litigation Trust D&O Claims, and any Rights of Action assigned to the Plaintiff Litigation Trust." Section 6.8 of the confirmed Think3 Plan provides that any and all claims and causes of action owned of the Debtor (Think3) or the estate shall vest in the Plaintiff Litigation Trust, and shall include those claims and causes of action identified on the "Schedule of Preserved Rights and of Action" attached to the Plan. See Plan (case no. 11-11252, dkt# 533, p. 30).

In turn, "Rights of Action" is defined in Exhibit A of the Plan as:

 [A]ny and all claims, *debts,* demands, rights, defenses, causes of action, suits, *contracts*, agreements, obligations, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character

whatsoever, known or unknown, suspected or unsuspected, whether arising before, on, or after the Petition Date, *in contract* or in tort, at law or in equity, or under any other theory of law, of the Debtor or its Estate. (*emphasis added*). See Plan (case no. 11-11252, dkt# 533, p. 56)

Further, the Schedule of Preserved Rights of Action that is attached to the Plan preserves and retains (1) "all claims, *debts*, causes of action, *contracts,* and agreements", arising under "*contract* or tort", of the Debtor Think3 and the estate; and (2) the "Litigation Trust D&O Claims", which is defined to include any and all causes of action against Defendant Zuccarello, who is specifically named as a potential defendant.  *See* Plan (case no. 11-11252, dkt# 533, pp. 105-108). For good measure, Exhibit A to the Plan also defines "Italian Former Employee Defendants" as specifically including Defendant Zuccarello by name, and Litigation Trust D&O Claims includes all claims and cause of action against such Italian Former Employee Defendants. *See* Plan (case no. 11-11252, dkt# 533, pp. 52, 53).

For a plan and disclosure statement to sufficiently retain and transfer rights to a liquidation trustee under § 1123(b)(3), a reservation does not need to specifically itemize each and every claim. *See Tex. Wyo. Drilling*, 647 F.3d at 552 (recognizing that a plan's categorical reservation of "preference claims" was sufficiently specific, and need not itemize individual transfers that may be preferential).

Here, the confirmed Think3 Plan (in multiple places) specifically reserved all contract and debt claims of the Debtor Think3 and specifically identified Defendant Zuccarello by name as a potential defendant, in an unequivocal manner, for the Plaintiff Trust. Unlike the reservation in *SI Restructuring* (which dealt with a simple blanket reservation of avoidance actions and claims under any other statute or legal theory), the reservation in the Think3 Plan specifically identified the type of claim at issue (contract and debt) and specifically named the defendant (Defendant Zuccarello). *Cf. SI Restructuring,* 714 F.3d at 863. As a result, Plaintiff Trust has standing to bring Count 6 for breach of contract against Defendant Zuccarello.

For these reasons, the request for dismissal by Defendant Zuccarello under Rule 12(b)(6) of Count 6 of the Complaint must be denied.

## IX.
## DISALLOWANCE, SUBORDINATION,
## AND DECLARATORY JUDGMENT REGARDING CLAIMS (Count 7, 8, 9)

Counts 7, 8, and 9 of the Complaint seek disallowance, subordination, and declaratory judgment with respect to claims that the Defendants may have against the Think3 estate being administered by Plaintiff Trust. The Defendants have sought dismissal of certain of these Counts under Rule 12(b)(6) on various grounds.

A. **Disallowance of Claims (Count 7)**

Through Count 7 of the Complaint, Plaintiff Trust seeks disallowance of any claims of Defendant Zuccarello and Defendant Giudici under 11 U.S.C. § 502(b)(1) based on these Defendants' allegedly fraudulent and improper behavior. Also, in Count 7, Plaintiff Trust requests disallowance of any claims that Defendant Zuccarello or Defendant Giudici might have under 11 U.S.C. § 502(d) as they have not repaid alleged preferential and fraudulent transfers that they have received. Plaintiff Trust specifically pleads in Count 7 that Defendant Zuccarello and Defendant Giudici are entities from which property is recoverable under § 550 of the Bankruptcy Code as they are transferees of transfers avoidable under § 544, § 547, and § 548 of the Bankruptcy Code (preferential and fraudulent transfers).   *See* Complaint ¶¶ 71–75.

Defendants Zuccarello and Giudici seek dismissal of Count 7 primarily on the basis that they have not filed a proof of claim against the Think3 estate under 11 U.S.C. § 501, they were not scheduled in the bankruptcy as holding undisputed claims, and the deadline for filing proofs of claims has long since passed. As a result, these Defendants argue that Plaintiff Trust cannot object to and seek disallowance of "nonexistent" claims. *See* Motions, p. 44 (dkt# 54-1); p. 49 (dkt# 62-1).

The Court may take judicial notice in the Rule 12(b)(6) context that  Defendants Zuccarello and Giudici have not filed proofs of claim against the Think3 bankruptcy estate and were not scheduled as holding undisputed claims. However, this is not dispositive.

This is because if Plaintiff Trust is successful in recovering transfers from Defendants Zuccarello and Giudici under § 550 of the Bankruptcy Code as alleged in the Complaint, these Defendants would have a "claim back" against the Think3 estate and may then file a proof of claim for the amount of any such recovery. In this regard, § 502(h) of the Bankruptcy Code provides that a claim arising from the recovery of property under § 550 of the Bankruptcy Code shall be determined and allowed or disallowed under § 502 of the Bankruptcy Code as if the claim had arisen before the date of the bankruptcy petition. Bankruptcy Rule 3002(c)(3) provides that a proof of claim for an unsecured claim which arises or becomes allowable as a result of a judgment for the recovery of money or property, may be filed within 30 days after the judgment becomes final. In turn, Bankruptcy Rule 3003(c)(3) (which applies in a Chapter 11 case like the Think3 case), states that notwithstanding the expiration of the deadline for filing proofs of claim, a proof of claim may be filed under the conditions set forth in Bankruptcy Rule 3002(c)(3). *See generally, In re Dunhill Resources, Inc.,* 2007 WL 3376244 at *2 (Bankr. S.D. Tex. November 5, 2007) (explaining right to file a proof claim for § 550 recovery within the extended period of 30 days after final judgment under Bankruptcy Rule 3002(c)(3)).

So, as a result of Plaintiff Trust's § 550 recovery action against Defendants Zuccarello and Giudici, it is plausible that such Defendants would have the right to file a proof of claim against the Think3 estate within the 30-day extended time period

provided by Bankruptcy Rule 3003(c)(3) and § 502(h). Adjudication of the disallowance or allowance of any such claims by these Defendants in this one adversary proceeding would promote both judicial and party economy.

For these reasons, the Court concludes that the request for dismissal by Defendant Zuccarello and Defendant Giudici under Rule 12(b)(6) of Count 7 for disallowance of claims must be denied.

**B.  Subordination of Claims (Count 8)**

Through Count 8 of the Complaint, Plaintiff Trust seeks "subordination" of any claims of all Defendants under 11 U.S.C. § 510(b) and/or § 510(c). Plaintiff Trust specifically alleges that any claim by Defendants should be equitably subordinated to claims of all other creditors and equity interest holders due to inequitable conduct and unfair advantage. *See* Complaint ¶¶ 76–78.

All the Defendants seek dismissal under Rule 12(b)(6) of Count 8 on various grounds. In sum, Defendants seek dismissal of Count 8 because they have not filed proofs of claim against the Think3 estate, the Complaint fails to sufficiently allege grounds for equitable subordination under § 510(c), and that mandatory subordination under § 510(b) does not apply.

To begin with, Count 8 was originally filed against all the Defendants— Defendants Costello, Kaufmann and Perry (who have not allegedly received transfers recoverable under § 550 of the Bankruptcy Code) as well as Defendants Zuccarello and Giudici (who have allegedly received transfers recoverable under § 550 of the Bankruptcy Code). Defendants Costello, Kaufmann and Perry were not scheduled as holding undisputed claims against Think3, these three Defendants have not filed proofs of claim against the Think3 estate, and the deadline for filing proofs of claim has expired. Most importantly, these three Defendants have no right to file a proof of claim under § 502(h) within the extended time period provided by Bankruptcy Rule 3003(c)(3) since no § 550 recovery is sought against these three Defendants. Further, Plaintiff Trust has effectively conceded in its Response and at oral argument that it has no subordination claims under Count 8 against Defendants Costello, Kaufmann and Perry. *See* Response, p. 36 (dkt# 39). Accordingly, Count 8 of the Complaint will be dismissed in its entirety as to Defendants Costello, Kaufmann and Perry.

Turning now to Defendants Zuccarello and Giudici, the Court concludes that the Count 8 of the Complaint sufficiently pleads a plausible claim for equitable subordination under § 510(c) of the Bankruptcy Code against these two Defendants. In general, § 510(c) provides that a court may subordinate for purposes of distribution all or part of an allowed claim under principles of equitable subordination. The Fifth Circuit has crafted, based on common law principles, a widely followed standard authorizing equitable subordination if three requirements are met. Equitable subordination is permitted when (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant;

and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *See, e.g., Wooley v. Faulkner (In re SI Restructuring, Inc.),* 532 F.3d 355, 360 (5th Cir. 2008) (supporting citations omitted); *In re Cajun Electric Coop., Inc.,* 119 F.3d 349, 357 (5th Cir. 1997) (supporting citations omitted). Equitable subordination is usually employed only in three types of settings: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors. *See Cajun Electric,* 119 F.3d at 357 (citing *In re United States Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994)). The typical case of equitable subordination based on control of a debtor involves a corporate insider. *See Cajun Electric,* 119 F.3d at 357.

Here, Plaintiff Trust's Complaint contains factual allegations, which if true, may plausibly result in equitable subordination of any claims of Defendants Zuccarello and Giudici. For example, the Complaint alleges that Defendants Zuccarello and Giudici were insiders and fiduciaries of the debtor Think3 (as Chief Executive Officer and Chief Operating Officer); that they engaged in inequitable conduct by requiring and obtaining promissory notes with high interest rates from Think3 without consideration and security interests in Think3 assets; that they arranged for payment to themselves while creditors were not being paid; and that such conduct resulted in harm to other creditors that went unpaid and conferred an advantage to these Defendants in the form of payments from Think3 as a result of "New Notes", "Side Agreements", a "Mandatory Prepayment Agreement", and a "consultant" agreement. *See* Complaint ¶¶ 4, 7, 22, 28, 35–38, 40–41, 78.

For the same reasons already stated by the Court with respect to Count 7, dismissal of Count 8 (equitable subordination of claims) is not warranted, as Defendants Zuccarello and Giudici would be entitled to file proofs of claim against the Think3 estate based on any recovery under § 550 of the Bankruptcy Code.  Accordingly, the request for dismissal by Defendants Zuccarello and Giudici under Rule 12(b)(6) of Count 8, to the extent it seeks equitable subordination of claims under § 510(c) of the Bankruptcy Code, must be denied.

On the other hand, to the extent Count 8 of the Complaint seeks subordination of claims under § 510(b) of the Bankruptcy Code against Defendants Zuccarello and Giudici, it must be dismissed. In general, § 510(b) of the Bankruptcy Code provides for mandatory subordination of claims arising from rescission and damages from the purchase or sale of securities of a debtor. Section 510(b) effectuates one of the general principles of bankruptcy and corporate law—that creditors are entitled to be paid ahead of shareholders, and that claims by shareholders which based on the purchase or sale of the debtor's equity shares should be subordinated to creditors. *See generally SeaQuest Diving LP v. S & J Diving, Inc. (In re Seaquest Diving, LP),* 579 F.3d 411, 417–23 (5th Cir. 2009) (supporting citations omitted).

Here, Plaintiff Trust's Complaint is devoid of any factual allegations that would support mandatory subordination under § 510(b) of the Bankruptcy Code. The only

claims of Defendants Zuccarello and Giudici subject of subordination are the "claims back" against the Think3 estate under § 502(h) for any § 550 recoveries, as set forth by the Court above. These claims by Defendants Zuccarello and Giudici against the Think3 estate for possible § 550 recoveries have nothing to do with the rescission, purchase or sale of securities of the debtor Think3, and there are no factual allegations in the Complaint to support such a theory. And at the hearing on the Motions, counsel for Plaintiff Trust effectively conceded that § 510(b) subordination does not apply. As a result, Count 8 of the Complaint, to the extent it seeks subordination under § 510(b) of the Bankruptcy Code against Defendants Zuccarello and Giudici, must be dismissed for failure to state a claim under Rule 12(b)(6).

In conclusion, Count 8 of the Complaint must be dismissed in its entirety as to Defendants Costello, Kaufmann and Perry under Rule 12(b)(6) for failure to state a claim. Count 8 of the Complaint, to the extent it seeks subordination against Defendants Zuccarello and Giudici based on 11 U.S.C. § 510(b), must also be dismissed under Rule 12(b)(6) for failure to state a claim. Finally, Count 8 of the Complaint, to the extent it seeks equitable subordination of claims against Defendants Zuccarello and Giudici based on 11 U.S.C. § 510(c), will not be dismissed.

## C. Declaratory Judgment Regarding Claims (Count 9)

Through Count 9 of the Complaint, Plaintiff Trust seeks a "declaratory judgment" of the disallowance and subordination of the claims of all the Defendants under the federal Declaratory Judgment Act (28 U.S.C. §§ 2201–2202). *See* Complaint ¶¶ 79–80.

To start, Count 9 was originally filed against all the Defendants—Defendants Costello, Kaufmann and Perry (who have not allegedly received transfers of property recoverable under § 550 of the Bankruptcy Code) and against Defendants Zuccarello and Giudici (who have allegedly received transfers of property recoverable under § 550 of the Bankruptcy Code). Accordingly, Count 9 suffers from the same fatal defect as Count 8 (subordination of claims) with respect to Defendants Costello, Kaufmann and Perry. In its pleadings, Plaintiff Trust has effectively conceded that it has no declaratory judgment claim under Count 9 against Defendants Costello, Kaufmann and Perry. *See* Response, p. 36 (dkt# 39). Accordingly, Count 9 of the Complaint will be dismissed in its entirety as to Defendants Costello, Kaufmann and Perry.

Defendants Zuccarello and Giudici have also sought dismissal of Count 9 for declaratory judgment on the basis that they have not filed any proof to claim and thus there is no "actual controversy" that is "ripe" for a declaratory judgment adjudication under 28 U.S.C. § 2201. *See* Motions, p. 46 (dkt# 54-1); p. 51 (dkt# 62-1).

For a federal court to issue a declaratory judgment under the Declaratory Judgment Act of 28 U.S.C. § 2201, an "actual controversy" must exist between the parties. Courts have recognized the difficulty of fashioning a precise test for identifying an actual justiciable controversy. *See Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986). According to the Supreme Court, the "question in

each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941); *see also Middle South Energy,* 800 F.2d at 490.

The purpose of the federal Declaratory Judgment Act is to afford one threatened with liability an "early adjudication" without waiting until his adversary should see fit to begin an action after the damage has accrued. *Rowan Co. v. Griffin,* 876 F.2d 26, 28 (5th Cir.1989) (supporting citations omitted). The declaratory judgment vehicle also is intended to provide a means of settling an actual controversy before it ripens into a violation of the civil law or a breach of a contractual duty. *Griffin*, 876 F.2d at 28 (supporting citations omitted).

With these principles in mind, the Court concludes that under the circumstances and the facts alleged in this adversary proceeding, there is a sufficient actual controversy for Plaintiff Trust to bring a declaratory judgment action against Defendants Zuccarello and Giudici for subordination and disallowance of any claims. As set forth by the Court above, as a result of Plaintiff Trust's § 550 recovery action against Defendants Zuccarello and Giudici, such Defendants would have the right to file a proof of claim against the Think3 estate within the extended time period provided by Bankruptcy Rule 3003(c)(3) and § 502(h).

The purpose of the Declaratory Judgment Act is served as Plaintiff Trust desires an early adjudication of the disallowance or subordination of such claims without waiting to see if its adversaries (Defendants Zuccarello and Giudici) should see fit to bring an action by filing a proof of claim based on any § 550 recovery. An early and prompt adjudication of the disallowance or subordination of any such claims by these Defendants in this same adversary proceeding would avoid piece-meal subsequent litigation and promote both judicial and party economy. The facts alleged by Plaintiff Trust in the Complaint to support declaratory relief for disallowance and subordination are many of the same facts alleged that support other claims made by Plaintiff Trust against Defendants Zuccarello and Giudici. *See* Complaint ¶¶ 4, 7, 22, 28, 35–38, 40–41, 44–47, 62–68, 72, 78–80. Plaintiff Trust and Defendants Zuccarello and Giudici have adverse legal interests and are already parties to this adversary proceeding. To wait until this adversary proceeding is adjudicated and see if Defendants Zuccarello and Giudici file proofs of claim for any § 550 recovery, and then adjudicate in separate subsequent litigation whether such claims should be disallowed or subordinated, would be wasteful and could delay distributions to other creditors having allowed claims in the Think3 bankruptcy case.

For these reasons, the request for dismissal by Defendants Zuccarello and Giudici under Rule 12(b)(6) of the declaratory judgment action set forth in Count 9 of the Complaint must be denied.

In conclusion, Count 9 of the Complaint must be dismissed in its entirety as to
Defendants Costello, Kaufmann and Perry under Rule 12(b)(6) for failure to state a
claim. Count 9 of the Complaint against Defendants Zuccarello and Giudici for
declaratory judgment will not be dismissed.

## X.
## REQUEST FOR TRANSFER OF VENUE

Alternatively, the Director Defendants (Defendants Zuccarello, Costello,
Kaufmann and Perry) have requested this Court to transfer venue of this adversary
proceeding to the U.S. District Court for the District of Delaware.[11]   In support, the
Director Defendants primarily rely on Think3's incorporation in Delaware and the
resulting application of Delaware corporate law to many disputes in this proceeding.
However, without more, the Director Defendants have failed to meet their burden to
demonstrate that transfer of venue to Delaware is warranted.

### A. Legal Standard for Transfer of Venue

The statutory basis cited for transfer of venue is 28 U.S.C. § 1412, which is
incorporated by Bankruptcy Rule 7087.[12] 28 U.S.C. § 1412 provides that "[a] district
court may transfer a case or proceeding under Title 11 to a district court for another
district, in the interest of justice or for the convenience of the parties."

To begin with, the movant has the burden to establish by a preponderance of the
evidence that venue of an adversary proceeding or bankruptcy case should be
transferred.  *See, e.g., In re Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1241 (5th
Cir. 1979) *cert. denied*, 444 U.S. 1045 (1980); *Gulf States Exploration Co. v. Manville
Forest Prods. Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1390 (2d
Cir. 1990); *Zazzali v. 1031 Exchange Group (In re DBSI, Inc.)*, 478 B.R. 192, 194
(Bankr. D. Del. 2012).

A presumption exists that the district in which the underlying bankruptcy case is
pending is the appropriate district for determination of an adversary proceeding. *See,
e.g., Marroquin v. Taylor Bean & Whitaker Mort. Corp.*, 2013 WL 1703867, at *2 (Bankr.
W.D. Tex. April 19, 2013) (transferring venue of adversary proceeding to the district
where underlying bankruptcy case is pending); *In re Patriot Coal Corp.*, 482 B.R. 718,
739 (Bankr. S.D.N.Y. 2012). Accordingly, there is a presumption that this Court—the
U.S. Bankruptcy Court for the Western District of Texas where Think3's bankruptcy
case is pending—is the proper forum, as venue is proper in this district. *See* 28 U.S.C.

---

[11] At the hearing on the Motion, counsel for the Director Defendants advised the Court that their
request was to transfer venue to the U.S. Bankruptcy Court (not the U.S. District Court) for the
District of Delaware.

[12] The Director Defendants also cite to 28 U.S.C. § 1404 as a statutory basis for venue transfer,
but correctly acknowledge that the statutory language of § 1404 is similar to § 1412 so the same
standards are applied by the courts. *See* Motion, p. 48 n.35 (dkt# 20-1).

§ 1409(a). However, the location of the debtor's bankruptcy case is not the only factor to evaluate to determine whether venue should be transferred. *See Norton v. Encompass Services Corp.*, 301 B.R. 836, 839 (S.D. Tex. 2003).

There are two statutory grounds to transfer venue under 28 U.S.C. § 1412. Since the statute is written in the disjunctive, venue may be transferred upon a showing that either (1) the interest of justice *or* (2) the convenience of the parties, warrants transfer. *See, e.g., Taylor Bean,* 2013 WL 1703867, at *2 (supporting citations omitted).

Section 1412 grants a court broad discretion to retain or transfer venue to another district, in the interest of justice or convenience of the parties. See *In re BDRC Lofts, Ltd.*, 2013 WL 395129, at *2 (Bankr. W.D. January 31, Tex. 2013) (supporting citations omitted); *In re Moss*, 249 B.R. 411, 425 (Bankr. N.D. Tex. 2000); *see also Commonwealth Oil,* 596 F.2d at 1247.

## B. <u>Interest of Justice</u>

The first path under 28 U.S.C. § 1412 is that transfer of venue is warranted in the "interest of justice." Generally, the "interest of justice" standard is flexible, and the courts consider the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. *See BDRC Lofts,* 2013 WL 395129 at *2. Factors that the courts consider include the following:

(a) Efficiency and economics of estate administration;
(b) Presumption in favor of the "home court";
(c) Judicial economy and efficiency;
(d) Fairness and the ability to receive a fair trial;
(e) The state's interest in having local controversies decided within its borders; and
(f) Plaintiff's original choice of forum.

*See BDRC Lofts*, 2013 WL 395129 at *2; *A.B. Real Estate, Inc. v. Bruno's Inc. (In re Bruno's, Inc.)*, 227 B.R. 311, 324–25 (Bankr. N.D. Ala. 1988).

The first factor–the efficiency and economics of estate administration–is referred to by some courts as the most important factor. *See Bruno's,* 227 B.R. at 324; *Sabre Technologies L.P. v. TSM Skyline Exhibits, Inc.*, 2008 WL 4330897, at *9 (S.D. Tex. September 18, 2008). Here, the cost to Plaintiff Trust, which is the successor to the bankruptcy estate of Think3, would be higher if this adversary proceeding were transferred to Delaware. As a result, the additional cost to Plaintiff Trust of litigating in a different forum (Delaware) will likely reduce the recovery (if any) to creditors of Think3 from this adversary proceeding. *See* Plaintiff's Reply ¶ 93 (dkt# 39). This factor weighs in favor of the Plaintiff Trust and denying the request to transfer venue to Delaware.

The second factor–a presumption in favor of the home court–is based on the rationale that it is preferable for the court that has jurisdiction over the bankruptcy case to adjudicate adversary proceedings relating to the bankruptcy case. *See Bruno's,* 227 B.R. at 326. This factor weighs in favor of not transferring venue; as the "home court" is

here in the Western District of Texas where Think3's bankruptcy case is pending, and this adversary proceeding was filed in the Western District of Texas.

The third factor–judicial economy and efficiency–include issues that may overlap with other factors, and has been described as follows:

> [T]he home court's familiarity with the substantive issues and familiarity with the law to be applied in the proceeding (i.e., "the learning curve"); the caseload of the respective courts and thus whether the time to trial is shorter or substantially longer in one forum as opposed to the other; the respective availability of the courts for resolving discovery disputes and for moving the case toward trial at a reasonable pace given the issues involved. *Bruno's,* 227 B.R. at 327–28.

The primary thrust advanced by the Director Defendants in support of venue transfer is that substantive issues of Delaware corporate law are involved in this adversary proceeding, which would best be handled by a Delaware court. However, the "learning curve" of Delaware corporate law is not as great as the Director Defendants suggest. Bankruptcy courts are regularly called upon to decide issues of corporate law of another state. Indeed, Texas bankruptcy courts are often required to interpret Delaware corporate law; just as Delaware bankruptcy courts are often required to interpret Texas law. *See, e.g., Reed v. Linehan (In re Soporex, Inc.),* 463 B.R. 344, 367–403 (Bankr. N.D. Tex. 2011); *Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.),* 407 B.R. 112, 125–31 (Bankr. D. Del. 2009). With all due respect to the Delaware courts (which are renowned for their expertise in both corporate and bankruptcy law), courts in other states are constantly interpreting and applying Delaware law given the sheer number of corporations and artificial entities formed under the laws of Delaware. Delaware courts would be swamped if every time a Delaware corporate law issue is raised in a suit pending in another forum, venue of the suit was then transferred to Delaware. And this adversary proceeding involves more than just Delaware corporate law—preferential transfers, fraudulent transfers, and claims disallowance and subordination are alleged which are based on the Bankruptcy Code. Finally, a "learning curve" applies to both the law and facts of a case; and a Delaware court would not be familiar with the facts of the Think3 bankruptcy case. For these reasons, the benefit of a venue transfer to Delaware based on judicial economy and efficiency would be negligible.

The fourth factor–the ability to receive a fair trial–requires evidence that the court had a predisposition to rule in favor of one party or another or if there was concern about getting an impartial jury. *See Bruno's,* 227 B.R. at 328. Here, the Director Defendants have not raised any issue of receiving a fair trial in this Court; and they will certainly receive a fair trial.

The fifth factor–a state's interest in having local controversies decided within its border–provides a preference that local courts preside over disputes that involve their laws or disputes that occurred in their jurisdiction. *See Bruno's,* 227 B.R. at 326. Here,

this factor weighs in favor of the request of the Director Defendants for a transfer of venue to Delaware, as substantive Delaware corporate law issues are raised in this adversary proceeding. On the other hand this adversary proceeding also involves Bankruptcy Code causes of action, as well as Delaware corporate fiduciary causes of action. And this factor by itself—that laws of another state (Delaware) are implicated, is not enough to warrant transfer of venue to Delaware.

The sixth factor–the plaintiff's original choice of forum–is entitled to some weight and deference. *See Bruno's*, 227 B.R. at 328. In a venue transfer motion, a movant must prove the "necessity of the transfer." *Bruno's*, 227 B.R. at 328. Here, Plaintiff Trust originally filed this adversary proceeding in this Court (where the Think3 bankruptcy case is pending); this proceeding was not initiated in another forum by Plaintiff Trust and then removed to this Court. Accordingly, this factor weighs against transfer of venue to Delaware.

After considering and weighing these factors in this particular adversary proceeding, the Court concludes that the Director Defendants have not shown that justice will be served by transfer of venue to Delaware.

## C. <u>Convenience of Parties</u>

The second path under 28 U.S.C. § 1412 is that the venue transfer is necessary for the "convenience of the parties." Under this path, courts have examined the following factors that are relevant to this adversary proceeding:

(a) Location and proximity of the parties;
(b) Ease of access to necessary proof;
(c) Convenience of witnesses, including their location and proximity;
(d) Location of the assets, including books and records;
(e) Availability of subpoena power for the unwilling witnesses; and
(f) Expenses related to obtaining witnesses.

*See BDRC Lofts*, 2013 WL 395129, at *2; *Moss*, 249 B.R. at 425; *Bruno's*, 227 B.R. at 325.

The first factor–the location and proximity of the parties–refers to the physical location of the parties, rather than their state of incorporation. *See Bruno's*, 227 B.R. at 330. Here, this factor weighs against transfer of venue to Delaware. Plaintiff Trust is located in the State of Texas, and was created pursuant to a plan of reorganization confirmed by a federal court in the State of Texas (this Court). The Director Defendants are not physically located in Delaware; instead three of them are located in California (Defendants Costello, Kaufmann and Perry) and one is located in Italy (Defendant Zuccarello). The only other party (Defendant Giudici) is located in Italy. None of the parties are physically located in or reside in Delaware. Simply put, it is not more convenient for the Director Defendants to travel to Delaware than it is for them to travel to Texas. Indeed, for the majority of the Director Defendants that reside in California, a journey to Texas would be shorter than to Delaware. Accordingly, this factor does not

warrant the transfer of this adversary proceeding from Texas to Delaware.

The second factor–the ease of access to necessary proof–requires evidence from the moving party that the "material or necessary proof" will be in the sought-after venue. *See Bruno's,* 227 B.R. at 330. Here, the Director Defendants made no showing that the material or necessary proof is easier to access if this adversary proceeding was transferred to Delaware.

The third factor–the convenience of the witnesses–allows the court to take into consideration the travel requirements and burden imposed on witnesses that would have to travel to a further location. *See Bruno's,* 227 B.R. at 330. At this stage of this adversary proceeding, no witnesses have been identified other than the parties themselves. And it is not more convenient for the parties (which are located in the States of California and Texas and the country of Italy) to sojourn to Delaware rather than Texas. No showing was made that any witness was located in Delaware. Accordingly, this factor does not support a transfer of venue to Delaware.

The fourth factor–location of the assets–also considers the location of books and records. *See BDRC Lofts,* 2013 WL 395129, at *4 (citing *In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir.1979), *cert. denied,* 444 U.S. 1045 (1980)). In the context of this particular adversary proceeding, this factor is similar to the access to proof factor addressed by the Court above. Here, no probative evidence was provided to the Court regarding the location of books and records necessary to this adversary proceeding. One could surmise that some of the books and records will be in the possession of the parties, and none of the parties are located in Delaware. But surmise is not sufficient proof that would warrant transfer of venue based on this factor.

The fifth factor–the availability of subpoena power for unwilling witnesses–allows a court to consider its power to compel certain witnesses to testify. *See Bruno's,* 227 B.R. at 330. Here, the Director Defendants did not allege or prove that a Delaware venue provides any benefit over the existing Texas venue in compelling witness testimony—and thus this factor does not support a transfer of this proceeding.

The sixth factor–the expenses related to obtaining witnesses–allows a court to consider the cost of having witnesses travel to testify for trial. *See Bruno's*, 227 B.R. at 331. Again, no evidence was provided as to potential witnesses other than the parties themselves. And for the reasons already stated by the Court regarding the scattered physical location of the party witnesses, this factor does not weigh in favor of transfer of venue to Delaware.

After considering and weighing these factors in this particular adversary proceeding, the Court concludes that the Director Defendants have not shown that the convenience of the parties would warrant transfer of venue to Delaware.

### D. **Conclusion-Venue Transfer**

In conclusion, the Director Defendants have not established by a preponderance of the evidence that this adversary proceeding should be transferred to the U.S. District Court (or the U.S. Bankruptcy Court) for the District of Delaware. Neither the interest of justice nor the convenience of the parties warrants a transfer of venue. Most of the relevant factors weigh against a transfer of venue to Delaware. Although the Director Defendants have gone to great lengths to demonstrate their lack of ties to Texas, little relevant evidence was provided as to why this adversary proceeding should be transferred to Delaware. No showing was made that any of the parties, key witnesses or evidence is located in Delaware, and three of the four Director Defendants are residents of California—which is closer to Texas than Delaware. The fact that the Defendants are former directors and officers of a corporation formed under Delaware law (Think3), is not sufficient by itself to warrant transfer of venue in this adversary proceeding.

For any and all of these reasons, the request to transfer venue by the Director Defendants to the District of Delaware must be denied.

## XI.
## CONCLUSION

When viewed through the restrictive prism that Rule 12(b)(6) requires, much of Plaintiff Trust's Complaint will survive until another day. The Court realizes that there will be another side to the story told in the Complaint–and that facts and proof (not just allegations and plausibility) will ultimately govern the outcome. There are mountains to be climbed and defenses to be scaled for Plaintiff Trust to ultimately prevail. Equally evident is that the Defendants will be forced to defend this suit and their actions in what they likely consider to be a faraway land.

This arduous preliminary skirmish, which involved hundreds of pages of pleadings and countless hours of effort, has now come to the end. The Court will enter a separate Order on the Motions To Dismiss under Rule 12(b)(6) filed by the Defendants consistent with this Opinion, and denying the request to transfer venue to Delaware. The Court will also enter an Order requiring the parties to conduct a planning conference and submit a proposed scheduling order, so that the discovery stage of this proceeding can commence.